# EXHIBIT A

# COLLECTIVE BARGAINING

# AGREEMENT

between

## Chester Casino and Racetrack Workers Union Council:

### UNITE HERE!
### Philadelphia Joint Board

### International Brotherhood of Teamsters, Local 312

### Laborers International Union of North America, Local 413

and

## Harrah's Chester Casino and Racetrack

### 5/1/08-4/30/13

**5.02. Combination Jobs.**

Except in those situations where the Council has negotiated a special "combination rate", when an employee works in two (2) or more job classifications in any day, he shall be paid for that day at the rates of pay for the time worked in each classification.

**5.03. Gratuities.**

All gratuities left by customers are the property of the employees exclusively, and no Employer or department heads not covered by this Agreement shall take any part of such gratuities or credit the same in any manner toward payment of any employee's wages. Except as provided otherwise in this Agreement, employees shall not be required to divide their gratuities with another person(s), and they shall not be coerced or discriminated against to cause them to do so. The Employer shall not post or display notices restricting gratuities; provided, however, that where the Employer has special events, sales promotions or other functions where the price charged includes gratuities, the Employer may publish and distribute literature, brochures and tickets for same which contain a notice of statement that gratuities are included in such price, if such notice or statement specifies which classifications of employees receive the gratuities. Bargaining unit toke committee shall administer bargaining unit tip pools. Union will discuss with Employer if changes are to be made regarding tipping out procedure and/or percentages prior to implementation.

## ARTICLE 6:  DISCHARGE

**6.01.  Just Cause.**

No employee shall be disciplined or discharged except for "Just Cause." Disciplinary actions shall be progressive and corrective in nature. Disciplinary notices shall include at a minimum; a written warning, a final warning or suspension and discharge. The parties agree that progressive discipline normally requires, prior to suspension or discharge, that an employee be given an opportunity to correct the deficiency through advance notice, additional training or adequate time to correct the deficiency. Notwithstanding the above, certain conduct as set forth in 6.02(a) will result in immediate discharge without resort to progressive discipline.

**6.02.  Cause for Discharge.**

(a)    No regular employee, after having completed the probationary period as defined under Article 10, shall be discharged except for just cause. Prior to any discharge for reasons other than dishonesty, willful misconduct, drunkenness, drinking on the job, sleeping on the job, being under the influence of a controlled substance on duty, unlawful possession of a controlled substance, or using a controlled substance at any time while on the Employer's premises, unlawful usage in accordance with the Employer's Drug & Alcohol policy, serious improper behavior or discourtesy toward a guest, insubordination, failure to report for work in accordance with the Employer's Attendance policy, walking off the job during a shift, possession of weapons on the Employer's property, and sexual harassment or any other inappropriate harassment of a co-worker or guest, or creating a hostile work environment as defined by law. Such an employee must be given a written warning and an opportunity to correct the deficiency. The above provisions relating to controlled substances will not apply to medicine lawfully prescribed for the employee using the substance by a licensed physician and used in accordance with the prescription.

5

(b)    Upon the discharge or suspension of any employee for reasons other than dishonesty, the reason therefore shall be given to the employee in writing, and a legible copy thereof shall be mailed or given to the Council within seventy-two (72) hours after the discharge or suspension. When an employee is discharged or suspended for willful misconduct, the notice shall contain the specific conduct or offense deemed by the Employer to constitute willful misconduct. Upon request by the Council, legible copies of all documents relied upon by the Employer in making the discharge or suspension, including copies of any written complaints or reports concerning the employee, either by the customer, an outside agency, or by the Employer's own employees, and copies of any relevant cash register tapes, shall be furnished to the Council within three (3) working days after such request. An employee may not be discharged solely on the basis of verbal complaints by customers. The Council shall furnish the Employer with any statements and/or documents pertinent to the investigation within seventy-two (72) hours of request. The Council will have the right to view copies of videotapes at the property during an investigation of a case.

**6.03.  Warning Notices.**

(a)    Warning notices issued to employees must specify the events or actions for which the warning is issued. Warning notices shall be issued to employees as soon as possible after the Employer is aware of the event or action for which the warning notice is issued and has a reasonable period of time to investigate the matter, and may be issued by the Employer any time throughout the day, as business allows. All warning notices must be given to employees no later than fifteen (15) days from the occurrence or knowledge of the event which results in the warning, except in situations involving ongoing investigations, including when the Employer's investigation is delayed due to a regulatory body conducting a parallel investigation of the same or similar issues or when the employee is on a leave of absence. In such circumstances, the time period will be extended until fifteen (15) days after the regulatory body has concluded its investigation or in case of leave of absences, fifteen (15) days after the leave has ended and has returned to work. However the employer will notify the Council within fifteen (15) days of the event bringing rise to the ongoing investigation by a regulatory body. A legible copy of any written warning notice shall be given to the employee for review by himself and, if requested, to the Council. Legible copies of all documents relied upon by the Employer in issuing the warning notice, including copies of any written complaints or reports concerning the employee, either by a customer, an outside agency or by the Employer's own employees, and copies of any relevant cash register tapes, shall be furnished to the Council within three (3) working days after such request.

(b)    A Union representative in conjunction with the employer's human resources department shall have the right to contact by phone customers who make written complaints against an employee if such are relied on by the Employer as a basis for the warning notice. An employee may not be issued a warning notice solely on the basis of verbal complaints by customers. Warning notices, written customer complaints and reports of outside agencies or the Employer's own security force concerning conduct of an employee (except sexual harassment or any other inappropriate harassment of a co-

6

worker or guest) shall become null and void 12 months after the date of issuance and may not thereafter be used as a basis for or in support of any subsequent discharge or disciplinary action.

**6.04.  Time of Discharge.**
No employee shall be discharged on his/her day off, while on vacation, or while on a leave of absence.

**6.05.  Licensure.**

    (a)    Pursuant to the laws, rules and regulations of the United States Department of Transportation, Pennsylvania Gaming Control Board, Pennsylvania Harness Racing Commission, Pennsylvania Liquor Control Board and the Pennsylvania Board of Health and other applicable federal, state and local authorities; employees of Pennsylvania Harrah's will be required to satisfy certain license requirements. A failure to obtain and/or maintain said license or to otherwise comply with above and the rules and regulations promulgated thereunder shall be grounds for immediate discharge and said discharge shall not be subject to the grievance and arbitration procedures of this Agreement, nor shall it be a breach of this Agreement.

    (b)    In the event the license of an employee so discharged for revocation is finally restored, said employee shall be entitled to reinstatement without break in seniority, but shall not be entitled to any back pay or benefits for the period of his separation. Said employee will replace the employee holding the lowest seniority number in the assigned job classification in his prior department. The reinstated employee will be permitted to bid using his seniority number on the first occasion of a bid opportunity, subsequent to his reinstatement; according to the seniority provisions contained in this Agreement. Notwithstanding the other provisions of this paragraph, an employee's entitlement reinstatement upon restoration of a revoked or suspended license shall expire three (3) months after the date of discharge.

    (c)    In the event the license of an employee lapses or expires, such employee will be conditionally discharged and will be entitled to reinstatement to his former position without loss of seniority if, within (14) days of such discharge, the employee applies for the license that lapsed or expired and reports back ready for work within seven (7) days of obtaining said license. Notwithstanding the provisions of this Paragraph, an employees' entitlement to reinstatement upon obtaining a previously lapsed or expired license shall expire three (3) months after the date of conditional discharge.

    (d)    In the event a renewal license is not issued by the United States Department of Transportation or other applicable federal or state agency within the time frame set forth above, the employee may if qualified in the Employer's judgment, and if properly licensed, assume an available, open position in a classification which does not require a license issued by the United States Department of Transportation or other applicable agency. When the employee obtains said license he may return to his former position without loss of seniority. If his former position has been filled, said employee would replace the employee holding the lowest seniority number in the job classification in the

prior department.  The employee will be permitted to bid using his seniority number of
first occasion of a bid opportunity, subsequent to his reinstatement, according to the
seniority provisions contained in this Agreement.

(e)      The employer shall pay the renewal fees for the Pennsylvania Gaming license and
for the Pennsylvania non-gaming license for bargaining unit employees.

## ARTICLE 7:  EARLY SHIFT RELEASE

**7.01.  Voluntary.**
An employee, with the Employer's approval, may voluntarily leave work early if he so desires
and shall be paid only for the time actually worked on that shift.  The Employer may solicit
volunteers for early shift release who shall be paid only for the time actually worked on that
shift.

**7.02.  Involuntary Release.**
The Employer may request that employees leave their shifts early due to lack of business,
whereupon employees shall be paid a minimum of four (4) hours or actual time worked,
whichever is greater; provided, however, that this provision is not intended to be used in bad
faith or to deny an employee legitimate overtime pay, and provided further that the Employer
will first take requests for early outs and then require early outs in ascending order of seniority of
those employees on duty, provided this does not require the Employer to pay overtime.

## ARTICLE 8:  NON-DISCRIMINATION

**8.01.  Prohibited Discrimination.**
There shall be no discrimination by the Employer or the Council against any employee because
of membership or activity on behalf of the Council; provided that an employee's Council
activities shall not interfere with the performance of his or other employees' work for the
Employer.  In accordance with applicable laws, there shall be no discrimination against any
employee with respect to compensation, terms, conditions, privileges of, or opportunities for
employment because of race, color, religion, sex, age, national origin, ancestry, disability, or
sexual orientation.

**8.02.  Diversity**

The Employer is committed to a diverse workforce, practicing equal employment opportunity
and engaging in serious efforts to create and maintain an environment that supports and
encourages the contribution of all employees.  We pledge to have a productive and hospitable
environment for current employees and potential applicants that invites a workforce reflective of
the diversity in the greater Chester area.  The employer is committed to respect the needs of the
current workforce, which includes immigrants from many different parts of the world.  We are
proud of that diversity and the benefits it brings to our property and the industry in general.  The
Employer will make efforts to obtain a diverse applicant pool that properly reflects the
population including, but not limited to, the African American community,

8

# EXHIBIT B



FOCUS - 9 of 13 DOCUMENTS

**DEAN KAWAILANI CHUNG, Plaintiff-Appellant vs. MCCABE HAMILTON & RENNY COMPANY, LTD., a Hawai'i corporation, KYLE SOARES, an individual, JOHN A. DIAS, an individual, HENRY R.K. LEE, an individual, DWIGHT SHAW, an individual, ROBERT T. GUARD, an individual, KRAIG M. KENNEDY, an individual, BOB M. BEE, an individual, and MATT B. GUARD, an individual, KINI KALAIWAA, an individual, ANDREW L. PEPPER, an individual, MARR HIPP JONES & PEPPER, a Hawai'i partnership, Defendants-Appellees and DOES 1-50, Defendants and Related Counterclaims**

NO. 25458

**SUPREME COURT OF HAWAI'I**

*109 Haw. 520; 128 P.3d 833; 2006 Haw. LEXIS 70; 179 L.R.R.M. 2431*

**February 17, 2006, Decided**

**PRIOR HISTORY:** [***1] APPEAL FROM THE FIRST CIRCUIT COURT. CIV. NOS. 00-1-0444 & 00-1-1771.
*McCabe Hamilton & Renny Co., LTD v. Chung, 98 Haw. 107, 43 P.3d 244, 2002 Haw. App. LEXIS 30 (Haw. Ct. App., 2002).*

**COUNSEL:** On the briefs:

Dane L. Miller and Wilma Sur, (Miller Tokuyama Kralik & Sur, LLP), for plaintiff-appellant.

John T. Komeiji, Michael A. Lorusso and Brian A. Kang, (Watanabe Ing Kawashima & Komeiji, LLP), for defendants-appellees.

**JUDGES:** MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, JJ. AND CIRCUIT JUDGE AUGUST, IN PLACE OF DUFFY, J., RECUSED.

**OPINION BY:** ACOBA

**OPINION**

[*522] [**835] OPINION OF THE COURT BY ACOBA, J.

We hold that (1) Defendants-Appellees Marr, Hipp, Jones, & Pepper (MHJP) and Andrew L. Pepper [collectively, Appellees], as attorneys for earlier and dismissed employer-defendants, may raise, as agents of their employers, the doctrine of preemption under the National Labor Relations Act (NLRA) on a summary judgment motion; (2) the claims of Plaintiff-Appellant Dean Kawailani Chung (Appellant) against Appellees for abuse of process and malicious prosecution, as well as the derivative claims of conspiracy and aiding and abetting related to these torts, are preempted under this court's holding in *Gouveia v. Napili-Kai, Ltd., 65 Haw. 189, 649 P.2d 1119 (1982)*; (3) Appellant's claims for intentional infliction [***2] of emotional distress (IIED) and false light invasion of privacy are not preempted under this court's holding in *Briggs v. Hotel Corp. of the Pac., Inc., 73 Haw. 276, 831 P.2d 1335 (1992)* and *Gouveia*; (4) Appellant's claim against Appellees for defamation and the derivative claims of conspiracy and aiding and abetting for this tort are not preempted under *Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S.*

*53, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966)*; and (5) Appellant's argument that the application of the preemption doctrine violates his *Seventh Amendment* right to a jury [**836] [*523] trial was not properly raised and is therefore waived. Applying these holdings, we affirm in part and vacate in part the October 23, 2002 final judgment of the circuit court of the first circuit [1] (the court) granting Appellees' motion for summary judgment and dismissing Appellant's consolidated amended complaint (the CAC) for lack of subject matter jurisdiction (the order), and remand this case for further proceedings in accordance with this opinion.

1   The Honorable Gary W. B. Chang presided.

[***3] I.

The decision of the Intermediate Court of Appeals (the ICA), *McCabe Hamilton & Renny Co. v. Chung, 98 Haw. 107, 43 P.3d 244 (App. 2002)* [hereinafter *McCabe*], provides a detailed description of the underlying dispute between Appellant and his co-workers at McCabe Hamilton & Renny, Co. (McCabe). Only the following condensed statement of the factual background is pertinent to this appeal.

A.

On January 7, 2000, following a confrontation between Appellant and co-workers Kyle Soares (Soares) and John Dias (Dias), McCabe, Soares, and Dias [collectively, the first TRO petitioners] filed an *ex parte* motion for a TRO in a special proceeding, S.P. No. 00-1-0010 (first TRO action). The first TRO petitioners were represented by Appellees. The court issued four TROs against Appellant and converted the special proceeding into a regular civil case. While the first TRO action was pending, McCabe fired Appellant.

On February 8, 2000, Appellant filed a complaint in Civil No. 00-01-0444 (case 0444) against McCabe, four of its executives -- Robert T. Guard, Kraig M. Kennedy, Bob M. Bee, and Matt B. Guard -- and four of Appellant's co-workers -- Soares, [***4] Dias, Henry R.K. Lee, and Dwight Shaw [collectively, the first McCabe defendants], claiming, *inter alia*, abuse of process and defamation.

On March 14, 2000, McCabe, Soares, Dias, and Earl Kini Kalaiwaa (Kalaiwaa) [collectively, the second TRO petitioners] filed a complaint and a renewed *ex parte*

motion for TRO (second TRO action) against Appellant, the latter being granted by the court. On March 23, 2000, an evidentiary hearing was held on the second TRO action and the second TRO petitioners' motion for a preliminary injunction. The court denied the motion and dismissed the action without prejudice on March 29, 2000.

On June 2, 2000, Appellant filed a second lawsuit in Civil No. 00-01-1771 (case 1771) against McCabe, Soares, Dias, and Kalaiwaa [collectively, the second McCabe defendants], asserting wrongful termination in violation of *Hawai'i Revised Statutes (HRS) § 378-2* (Supp. 1999), malicious prosecution of the second TRO action, abuse of process, and related claims.

On June 6, 2000, the International Longshore and Warehouse Union, Local 142, AFL-CIO (the ILWU) filed, on behalf of Appellant, a charge against McCabe with the [***5] National Labor Relations Board (NLRB).

The NLRB charge alleged that the state court actions brought against Appellant violated *Section 8(a)(1)*, [2] *29 U.S.C. § 158*, of the National Labor Relations Act (NLRA) because McCabe filed two lawsuits in retaliation for a labor dispute initiated by Appellant while he was engaged in activities protected by Section 7, [3] *29 U.S.C. § 157*, of the NLRA. Because McCabe lost its complaint on the [**837] [*524] merits and voluntarily sought a dismissal, the ILWU requested that the NLRB find that the filing of the lawsuits against Appellant constituted an unfair labor practice. The ILWU also requested that McCabe be required to reimburse the Union's and Appellant's attorneys their fees and costs incurred as a result of the two lawsuits. It appears that the NLRB charge was withdrawn. [4]

2   *Section 8(a)(1)* of the National Labor Relations Act (NLRA) states that "it shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in *section 157* of this title[.]" [***6]

3   *Section 7 of the NLRA* states:

> *Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own*

*choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,* and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in *section 158(a)(3)* of this title.

4   On August 18, 2005, this court ordered the parties to file supplemental briefs indicating the status of any proceedings before the National Labor Relations Board (NLRB) concerning the instant case. Appellant responded that he was unaware of any related proceedings before the NLRB. Appellees provided a similar response.

B.

The defendants removed both of Appellant's state cases, case 0444 and case 1771, to federal court, asserting federal jurisdiction pursuant to *section 301* of the Labor [***7] Management Relations Act (LMRA), *29 U.S.C. § 185 (1994)*. [5] By order dated April 5, 2001, the United States District Court for the District of Hawai'i (the district court) [6] granted, in part, the first and second McCabe defendants' motions for summary judgment. Both cases were decided under LMRA section 301, *29 U.S.C. § 185*, referred to as "section 301 preemption."

5   United States District Court for the District of Hawai'i Chief Judge Ezra consolidated the cases due to "common questions of law and fact."
6   The Honorable Helen Gillmor presided.

According to the district court, *LMRA section 301* "preempts state law claims between an employee and employer when those claims require the court to interpret the terms of collective bargaining agreements." It was ruled that Appellant's claim for tortious interference with contractual relations was preempted under *section 301*. Consequently, the district court dismissed the claim. The district court determined that [***8] the claims for IIED, conspiracy, and aiding and abetting were preempted in part, and dismissed the claims with some reservation. However, it was decided that Appellant's claims for abuse

of process, defamation, false light invasion of privacy, violation of public policy in connection with a wrongful termination, and punitive damages were *not* preempted under *section 301*. These claims were remanded to state court.

The district court's decision was based entirely upon *section 301* preemption. According to the district court, the McCabe defendants' alternative argument, that is, that Appellant's claims were preempted under the doctrine announced in *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959)*, was not addressed because *Garmon* did "not provide a basis for subject matter jurisdiction in the federal courts." [7] Accordingly, the district court deferred to the "state court [to] properly address defendants' arguments with respect to . . . *Garmon* preemption." [8]

7   The district court relied on *Ethridge v. Harbor House Rest., 861 F.2d 1389 (9th Cir. 1988)*.
[***9]
8   Under *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon, 359 U.S. 236, 244, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959)*, when a state seeks to regulate activities that are either protected under *§ 7* or constitute an unfair labor practice under *§ 8 of the NLRA*, state jurisdiction must yield. To allow the states to regulate this conduct is likely to result in a conflict between Congress's regulatory power and state imposed regulation and could potentially frustrate Congress's purposes. *Id.*

II.

Upon remand to the state court, Appellant filed a motion to file the CAC. The court granted the motion and on May 8, 2001, Appellant filed the CAC, asserting abuse of process, malicious prosecution, defamation, false light invasion of privacy, IIED, conspiracy, aiding and abetting one another in the aforesaid causes of action, violations of *HRS § 378-2*, negligent supervision, negligent infliction of emotional distress, and negligence. Appellant also joined Appellees as new parties.

On June 5, 2001, Appellees filed a motion to dismiss the CAC for [***10] lack of jurisdiction or, in the alternative, for summary judgment, arguing that (1) Appellant's anti-union theory involved protected rights under section 7 of the NLRA, *29 U.S.C. § 157*, and unfair

labor [**838] [*525] practices under section 8 of the NLRA, *29 U.S.C. § 158*, (2) because Appellant alleged Appellees committed an unfair labor practice, his remedies lay with the NLRB and not the court, and (3) *Garmon* preemption applied to Appellees as "agents" of Appellant's employer, McCabe.

At the July 20, 2001 hearing on the motion, [9] the court asked Appellant's attorney if "union busting [was] behind the entire series of transactions and actions brought against [Appellant] that gave rise to this particular lawsuit[.]" Counsel for Appellant responded that on February 8, 2000, the date of Appellant's original complaint, Appellant was unaware of incidents that would suggest that something other than "union busting" was behind the transactions:

[Appellant] did not know that Andy Pepper had talked to undercover cops on the waterfront about something so secret concerning [Appellant] that Mr. Pepper is more afraid of the [Honolulu [***11] Police Department (HPD) than he is of [Appellant]. [Appellant] did not know that Mr. Pepper was gonna accuse him of destroying his utility box and of stalking him. So all of these things come to fruition afterwards. We don't get any discovery until we're back in this court, when we know a [sic] about Mr. Pepper's conversations with undercover cops, when we know about now [sic] Mr. Guard hiring Matt Levi.

. . . .

I mean, I guess they're trying to say that we can't amend, that we are now judicially estopped, because on February 8th we believe that this was the motive on information and belief, Your Honor, we only allege that on information and belief. And now, of course, with every little inch of discovery I can squeeze out, the story becomes more apparent *that it didn't have anything to do with the union at all, it had something to do with my client, and it had something to do with knowing about his arrest and court record and trying to wrongfully exploit that.* Now, why? Only

McCabe, only Mr. Pepper, knows why. I don't know why. But now it's clear that the union had nothing to do with it, but it had everything to do with my client, and it had everything to do with [***12] his arrest record, that is clear, and that is the state interest, Your Honor.

[9] In addition to Appellees' motion, the hearing addressed McCabe's motion for summary judgment, Shaw's motion for summary judgment, and defendants/counterclaimants Soares, Dias, Shaw, Lee, and Kalaiwaa's motion for summary judgment.

Following arguments by counsel, the court ruled that Appellant's union activities motivated the defendants' conduct:

THE COURT: Okay. This motion the Court struggled with greatly, and I think part of the problem is the inherent conflict between the federal interest, which, if it exists, is paramount versus the state interest, that is to protect its citizens against certain conduct that violates common laws here in Hawaii.

The Court took some time to comb through the record in this matter to try to ascertain what is really going on in this entire matter, and the one conclusion the Court could not escape, and it always came back to, [Appellant's] association with the union. *And I [***13] think if [Appellant] were not associated with ILWU, that many, if not all, of these events would not have occurred. So the Court does believe that there is some union connection with the motive for all of these legal proceedings and affidavits and declarations to be executed, all designed to prosecute various claims against [Appellant].*

[Appellees' counsel] is correct, and the Court did note that the burden of proof is such that if there is an arguable claim that the [NLRA] applies, that *the state*

109 Haw. 520, *525; 128 P.3d 833, **838;
2006 Haw. LEXIS 70, ***13; 179 L.R.R.M. 2431

*court cannot take jurisdiction over this matter or any other claim, even if it is a claim for damages, which the NLRB does not provide any remedy for.*

Obviously, it disturbs this court a bit, *but this court cannot escape the conclusion that there appears to be some connection or motivation to undertake all these activities by the defendant[s] that rests with union organization and union activities, and it is for that reason this court reluctantly concludes that the preemption provisions of the [NLRA] do apply in this* [**839] [*526] *case, and therefore the Court will grant the motion.*

(Emphases added.)

On August 22, 2001, the court granted Appellees' motion to [***14] dismiss the CAC for lack of jurisdiction or, in the alternative, summary judgment. The court ruled that Appellant's claims were preempted and dismissed them with prejudice:

All claims, allegations, accusations and averments that were or could have been brought against [Appellees] in the [CAC], including but not limited to the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth causes of action, shall be, and hereby are, dismissed with prejudice, given that the Court does not have subject matter jurisdiction over those claims because they are subject to federal preemption pursuant to the doctrine promulgated in . . . *Garmon*[.]

The court did not render any findings of fact or conclusions of law.

III.

Both the first and second McCabe defendants eventually settled with Appellant and the court approved the settlement on May 20, 2002. On June 3, 2002, Appellant moved for reconsideration of the August 22, 2001 order granting Appellees' motion to dismiss, or in the alternative, summary judgment, citing new evidence that Appellees had brought the first TRO action against him "without the knowledge or authorization of the persons for whom [Appellees] [***15] sought relief." The court denied the motion on August 27, 2002, and entered final judgment on October 23, 2002. On November 8, 2002, Appellant appealed.

IV.

Appellant presents three issues on appeal. First, he contends that the predicate "fact" of Appellees' anti-union theory was not, and could not be, alleged on a *Hawai'i Rules of Civil Procedure (HRCP) Rule 12* motion to dismiss. Second, he argues that even if Appellant's anti-union theory implicated the NLRA, *Garmon* does not preempt state jurisdiction over serious torts or matters peripheral to federal labor law. Finally, Appellant maintains that preempting his claims would result in a violation of his constitutional rights, specifically his right to a trial by jury.

In response, Appellees argue that (1) Appellant is bound by his allegations of anti-union conspiracy under the doctrine of judicial estoppel because the courts have relied upon and accepted Appellant's position, (2) Appellant's allegations and repeated representations of anti-union conspiracy to the federal, state, and appellate courts, and the NLRB, involve protected rights under *NLRA section 7* and unfair labor practices under *NLRA section 8*, (3) *Garmon* [***16] requires the dismissal of Appellant's claims because they "actually, arguably or potentially conflict with federal law," (4) any limitation of Appellant's monetary remedies does not invalidate preemption, (5) in connection with Appellant's preemption arguments, the court did not err in dismissing alleged violations of *HRS 378-2*, [10] (6) Appellant improperly raises constitutional arguments for the first time on appeal, and assuming their consideration, the arguments are wholly without merit.

10  *HRS § 378-2* (Supp. 1999) proscribes certain conduct with regard to employment practices. In his reply brief, Appellant requests leave to amend Count IX of his complaint in order to assert his claims under *chapter 378 of the Hawaii Revised Statutes.* The claims were brought against the earlier McCabe defendants and subsequently dismissed, against Appellees. Appellees correctly contend in their fifth argument, that Appellant did not assert a claim against Appellees for violations of *chapter 378* and thus, said issue was not raised in the proceedings below. *See Bitney v. Honolulu Police Dep't*, 96 Hawai'i 243, 251, 30 P.3d 257,

109 Haw. 520, *526; 128 P.3d 833, **839;
2006 Haw. LEXIS 70, ***16; 179 L.R.R.M. 2431

*265 (2001)* (holding that "appellate courts will not consider an issue not raised below unless justice so requires"). Accordingly, we do not reach this issue.

[***17] V.

We address, first, Appellant's contention that his purported anti-union theory against Appellees could not be established on Appellees' *HRCP Rule 12* motion to dismiss. To the extent that Appellees' motion contained documents related to matters outside the pleadings, we treat the motion as a motion [**840] [*527] for summary judgment under *HRCP Rules 12(c)* [11] and *56*. [12] "Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki, 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983)* (quoting *Fernandes v. Tenbruggencate, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982)).* This court reviews a circuit court's grant or denial of summary judgment *de novo. French v. Hawaii Pizza Hut, Inc., 105 Hawai'i 462, 466, 99 P.3d 1046, 1050 (2004).* The standard for granting a motion for summary judgment is well settled:

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue [***18] as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Bremer v. Weeks, 104 Haw. 43, 51, 85 P.3d 150, 158 (2004).*

11   *Rule 12(c) of the Hawaii Rules of Civil Procedure (HRCP)* states in relevant part:

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule 56*, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by *Rule 56*.

12   *HRCP Rule 56* states in relevant part:

> (c) ***Motion and proceedings thereon.*** . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[***19] As to preemption, "the burden of establishing pre-emption rests with the party seeking the benefit of pre-emption." *Casumpang v. ILWU, Local 142, 94 Hawai'i 330, 340, 13 P.3d 1235, 1245 (2000)* (internal quotation marks and citation omitted). This "burden is a considerable one, which requires overcoming the starting presumption that Congress does not intend to supplant state law." *Id.* (internal quotation marks and citation omitted).

VI.

With regard to Appellees' first argument, although Appellees assert that Appellant is bound by his allegations of anti-union conspiracy under the doctrine of judicial estoppel, the inquiry as to whether Appellant is judicially estopped from now asserting that Appellees were motivated by reasons other than union animosity is not dispositive of the instant case. [13] We conclude that even assuming that Appellant is bound by his earlier assertion that Appellees acted because of Appellant's

union activities, application of the preemption doctrine is not precluded.

13    This court has previously stated that "pursuant to the doctrine of judicial estoppel, [a] party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by his action." *Roxas v. Marcos, 89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1998).* The purpose of judicial estoppel is to prevent parties from "playing 'fast and loose' with the court or blowing 'hot and cold' during the course of litigation." *Id.* (quoting *Rosa v. CWJ Contractors, Ltd., 4 Haw. App. 210, 219, 664 P.2d 745, 751 (1983)* (other citations omitted).

[***20]

For example, in *Linn*, a case involving a civil action for libel made in the course of a union organizing campaign, and therefore concerning a labor dispute, the Court ruled that the state court "does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him." *383 U.S. at 55.* In *Farmer v. United Bhd. of Carpenters, 430 U.S. 290, 293, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977),* the underlying complaint alleged that the defendants [**841] [*528] engaged in outrageous conduct arising from a disagreement between the parties over union policies. Despite reversal by the state appellate court in that case, the Court held that the NLRA did not preempt the action for IIED. *Id. at 302.* It was noted that the allegations made by the complainant in that case "might form the basis for unfair labor practice charges before the [NLRB,]" *id.,* and that "a rigid application of the *Garmon* doctrine might support the conclusion of the California courts that [the complainant's] entire action was preempted by federal law." *Id.*

However, the Court concluded that "inflexible application of [***21] the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Id.* Therefore, in considering the motion for summary judgment herein, the court was

required to engage in a weighing of the "federal interest in uniform regulation of labor relations with the traditional concern and responsibility of the State to protect its citizens", *Linn, 383 U.S. at 57,* against tortious conduct. Thus, even if Appellant is held to his earlier position that Appellees harbored anti-union animus in committing the alleged tortious conduct, the court is not absolved from deciding whether the claims at issue were subject to exceptions to the preemption doctrine.

VII.

This court has applied the *Garmon* preemption doctrine on two occasions. In *Gouveia*, the following frequently quoted passages from *Garmon* were declared the controlling principles:

> *When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by [section] 7 of the [NLRA], or* [***22] *constitute an unfair labor practice under [section] 8, due regard for the federal enactment requires that state jurisdiction must yield . . . . To allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.*

> *At times it has not been clear whether the particular activity regulated by the States was governed by [section] 7 or [section] 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance*

to the [NLRB].

*. . . When an activity is arguably subject to [section] 7 or [section] 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted.*

*[Garmon, 359 U.S. at] 244-45.*

*Gouveia,* 65 *Haw. at* 193-94, 649 *P.2d at* 1123 (brackets omitted) (some emphasis in original and some added). It was said that "the governing consideration is that to allow the States to control activities [***23] that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy." *Id. at* 194, 649 *P.2d at* 1123. *Gouveia* went on to recognize exceptions to *Garmon* preemption, explaining that "concurrent state-court jurisdiction" is permitted where (1) "the challenged conduct has been marked by violence and imminent threats to the public order," *id. at* 194, 649 *P.2d at* 1124 (internal quotation marks omitted), (2) "the activity regulated [is] a merely peripheral concern of the [NLRA]," *id. at* 195, 649 *P.2d at* 1124, (3) "the regulated conduct touches interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, . . . it could not [be] inferred that Congress has deprived the States of power to act[,]" *id.,* or (4) a "state's interest in protecting the health and well-being of its citizens . . . overrides the federal interest in a national labor policy[,]" *id., i.e.,* the harm "involves 'outrageous conduct, threats, intimidation, and words' which caused the plaintiff to suffer 'grievous mental and emotional distress [***24] as well as great physical damage[,]'" *id.* (quoting *Farmer,* 430 *U.S. at* 301).

[**842] [*529] This court further expounded on the *Garmon* preemption doctrine in *Briggs.* In their complaint, the plaintiffs in *Briggs* "complained merely of unfair labor practices which resulted in emotional and physical distress." 73 *Haw. at* 286, 831 *P.2d at* 1341. Therefore, it was held that dismissal was proper. *Id.* *Briggs* established the rule that "in order for a tort claim based on outrageous conduct to survive pre-emption, the outrageous conduct must be either 1) unrelated to

governed labor practices or 2) . . . accomplished in such an abusive manner that the *manner* itself becomes the basis for the claim." *Id. at* 285, 831 *P.2d at* 1341 (emphasis in original).

VIII.

As to Appellant's second argument that the claims in his CAC are not preempted, and Appellees' second and third counter-arguments, we examine each claim in light of the precepts established in *Gouveia* and *Briggs.*

A.

To begin, Appellant's first and second claims for relief, sounding in abuse of process, as alleged in paragraphs 81 to 87 and 88 to 94 of the CAC, [***25] respectively, were based on the first and second TRO actions brought against him by Appellees. The elements of the tort of abuse of process are "(1) an ulterior purpose and (2) a wilful act in the use of the process which is not proper in the regular conduct of the proceeding." *Wong v. Panis,* 7 *Haw. App.* 414, 420, 772 *P.2d* 695, 699-700 (1989), *abrogated in part by Hac v. Univ. of Hawai'i,* 102 *Hawai'i* 92, 73 *P.3d* 46 (2003). "Liability for abuse of process is imposed when the putative tortfeasor uses legal process 'primarily' for an ulterior motive." *Id.* (citing *Restatement (Second) of Torts* § 682 (1977)) [hereinafter, Restatement].

Appellant alleged the following in paragraphs 83 and 90:

*Defendants instigated and procured said court processes for ulterior and improper purposes, including without limitation: (a) retaliating against Plaintiff; (b) preventing Plaintiff from working as a stevedore; (c) blemishing Plaintiff's work history and blackening his character; (d) interfering with his probation; and (e) harassing and intimidating Plaintiff emotionally and financially.*

(Emphasis [***26] added.) Appellant further averred, in paragraphs 84 and 91, that "the use of the court processes for such purposes are purposes other than those for which the processes were designed and intended[]" and, in response, Appellees argue that "while [Appellant] mentions his abuse of process claims in passing, virtually

109 Haw. 520, *529; 128 P.3d 833, **842;
2006 Haw. LEXIS 70, ***26; 179 L.R.R.M. 2431

all of his arguments in his brief pertain to his malicious prosecution claim." Proffering no discussion as to any failure of Appellant to sufficiently allege abuse of process, Appellees simply contend that "courts routinely dismiss abuse of process claims where plaintiffs have acknowledged that a defendant's motive involved a labor-related animus." Accordingly, we do not reach the question of whether Appellant sufficiently pled the abuse of process claims. *See Taomae v. Lingle, 108 Hawai'i 245, 257, 108 Haw. 245, 118 P.3d 1188, 1200 (2005)* (stating that "this court may 'disregard [a] particular contention' if [a party] 'makes no discernible argument in support of that position'" (quoting *Norton v. Admin. Dir. of the Court, 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995)*)).

B.

However, based on a review of the record, we conclude that Appellant's [***27] claims for abuse of process are preempted by the NLRA. Appellant alleged retaliation, prevention of his ability to work, and the blemishing of his work history and character as several of the ulterior and improper purposes attributed to Appellees. [14] These relate to his employment [**843] [*530] and the exercise of his duties as shop steward for his union.

> 14   As earlier stated, Section 7 of the NLRA sets forth the rights of employees including the right to "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" *29 U.S.C. § 157.* Furthermore, Section 8 states that "it shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed under section 7[.]" *29 U.S.C. § 158.*

Having determined that the conduct may arguably be protected, *Gouveia* requires further analysis. Appellant argues that causes of action for abuse of process are "'deeply [***28] rooted' in local responsibility[,]" that the state has an interest "in protecting its citizens from abusive use of the courts[,]" and that the state has " a substantial interest in policing its own court system". However, given the circumstances of this case, we believe that such interests are insufficient to override the federal labor scheme.

The Supreme Court's decision in *Local 926, Int'l Union of Operating Eng'rs v. Jones, 460 U.S. 669, 103 S. Ct. 1453, 75 L. Ed. 2d 368 (1983)*, is instructive. In *Jones*, a former employee brought an action in state court for tortious interference alleging that after he resigned his union membership, the union coerced his employer into firing him, thereby breaching his employment contract. *Id. at 672-73.*

The Court concluded that the cause of action alleging the union's interference with an employment contract was preempted by the NLRA's prohibition against coercive interference. *Id. at 681-82.* It explained that "a fundamental part of such a claim is that the union actually caused the discharge and hence was responsible for the employer's breach of contract. Of course, this same crucial element must [***29] be proved to make out a . . . case [under the NLRA]." *Id. at 682.* Hence, the Court decided that "the federal and state claims are thus the same in a fundamental respect[.]" *Id.* The Court accordingly concluded that the state cause of action was preempted. *See also Lumber Prod. Indus. Workers Local No. 1054 v. W. Coast Indus., 775 F.2d 1042, 1049 (9th Cir. 1985)* (citing *Jones* for the proposition that a "state-law claim is preempted" "'if the conduct relied on to prove a crucial element in the state action is conduct that is arguably covered by the NLRA'" (quoting *460 U.S. at 682*)).

In the instant case, inasmuch as Appellant alleges retaliation, prevention of his ability to work, and injury to his work history as the ulterior motives for Appellees' alleged conduct, proving such allegations would be crucial elements of his abuse of process claims. A fundamental part of Appellant's claims is that Appellees acted after Appellant exercised his rights and duties as a union shop steward in voicing his concerns about alleged violations by McCabe of the union contract. Such rights and duties are encompassed by the mutual aid or protection [***30] clause of *section 7 of the NLRA*, interference with which is prohibited under *section 8* of the Act. *See e.g., N.L.R.B. v. City Disposal Sys., Inc., 465 U.S. 822, 833, 104 S. Ct. 1505, 79 L. Ed. 2d 839 (1984)* (explaining that a single employee's invocation of rights set forth in a [collective bargaining agreement (CBA)] is presumed to be concerted activity because the CBA was put into effect by group action).

With respect to the danger of interference with the

109 Haw. 520, *530; 128 P.3d 833, **843;
2006 Haw. LEXIS 70, ***30; 179 L.R.R.M. 2431

NLRA, the Fourth Circuit stated in *Richardson v. Kruchko & Fries, 966 F.2d 153 (4th Cir. 1992)*, as follows:

> Adjudication of the claims would require a court to pass on the legality under the NLRA of precisely the same conduct that is presently before the NLRB, and would risk frustration of national labor policy through inconsistent state-law judgments - precisely the evils that *Garmon* preemption seeks to avoid. "In a case where, as here, the substance of the dispute is the same under both state and federal law, the state law must yield to the jurisdiction of the NLRB."

*Id. at 158* (quoting *Parker v. Connors Steel Co., 855 F.2d 1510, 1518 (11th Cir. 1988)*). [***31] *See also Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 202, 98 S. Ct. 1745, 56 L. Ed. 2d 209 (1978)* (stating that, "when the same controversy may be presented to the state court or the NLRB, it must be presented to the Board"). Therefore, we hold that Appellant's claims for abuse of process, as well as the derivative claims relating to them, are preempted. *See Richard B. LeVine, Inc. v. Higashi, 131 Cal. App. 4th 566, 32 Cal. Rptr. 3d 244, 253-54 (Cal. App. 4 Dist. 2005)* (holding that aiding and abetting and conspiracy are derivative tort claims).

[**844] [*531] IX.

Similar to Appellant's claims for abuse of process, we hold that Appellant's claim for relief of malicious prosecution [15] under paragraphs 95 to 102 of the CAC, as well as the derivative claims of conspiracy and aiding and abetting as to this claim, are preempted.

> 15    This court has established that the tort of malicious prosecution requires "(1) that the prior proceedings were terminated in the plaintiff's favor; (2) *that the prior proceedings were initiated without probable cause*; and (3) that the prior proceedings were initiated with malice." *Reed v. City & County of Honolulu, 76 Haw. 219, 230, 873 P.2d 98, 109 (1994)* (emphasis in original).

[***32] A.

The basis for the malicious prosecution claim arises from the second TRO action wherein Appellees apparently alleged that Appellant was violent, had committed violence in the workplace, and presented an imminent danger of bodily harm in the workplace. On March 29, 2000, following an evidentiary hearing, the TRO court entered findings of fact, conclusions of law, and an order in favor of Appellant. McCabe filed a notice of dismissal on the same day, without prejudice.

Appellant maintained that an order was entered in his favor, that the second TRO action was initiated without probable cause, and that the action was filed in a "malicious" manner. In paragraph 95, Appellant "repeats, re-avers, and incorporates paragraphs 1 through 94" of the CAC. As earlier stated, paragraphs 83 and 90 of the CAC allege that the court processes, *i.e.*, the first and second TRO actions, were instigated for ulterior purposes having to do with retaliation and employment-related matters. Appellant further declared, under paragraph 102 of the CAC, that the conduct was "done with the intent to deprive [Appellant] of legal rights or otherwise to cause [Appellant] injury" and that such conduct [***33] was made "in conscious disregard of his rights[.]"

On appeal, Appellant again contends that his claim is not preempted because claims for malicious prosecution are "deeply rooted in local responsibility" under *Garmon*, and cites *Radcliffe v. Rainbow Const. Co., 254 F.3d 772 (9th Cir. 2000), cert. denied, 534 U.S. 1020, 122 S. Ct. 545, 151 L. Ed. 2d 423 (2001)*. In *Radcliffe*, union representatives were subjected to citizen's arrest for trespass and prosecution for their refusal to leave job sites. *Id. at 776*. The union representatives brought civil rights and state tort claims for, among others, false arrest, false imprisonment, and malicious prosecution against the defendants. *Id. at 776-77*. The United States district court entered summary judgment for the defendants dismissing the plaintiff's state tort claims.

The Ninth Circuit court reversed as to the dismissal of the state-law claims for false arrest, false imprisonment, and malicious prosecution, concluding that these claims were not preempted by the NLRA. In doing so, that court stated that the freedom of citizens from these torts

> touch interests so [***34] deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress

had deprived the States of power to act. . .
. *Thus false arrest, false imprisonment,
and malicious prosecution are similar to
torts of threatened violence, traditionally
held not to be preempted, or [IIED], and
defamation, both of which the Supreme
Court has held to be excepted from
Garmon's preemption rule even though
they involve conduct arguably protected
or prohibited by the NLRA.*

*Id.* at 785 (emphasis added and in original) (internal
citations omitted). The *Radcliffe* court further explained
that the fact that such claims might constitute an unfair
labor practice "does not inevitably cause preemption of
the state claim." *Id.*

Appellees contend that *Radcliffe* is inapposite to the
instant case because that court's holding was premised on
an issue not before this court, namely trespass, that
clearly implicated property rights traditionally protected
by states. Central to the *Radcliffe* court's decision was
that California's general trespass statute did not apply to
"lawful union activity" on [***35] the employer's
premises. *Id.* at 777. That court reasoned that "the
property [**845] [*532] right underlying the law of
trespass, of course, is a matter of state law." *Id.* at 784.

B.

As earlier stated, this court in *Gouveia* recognized, as
Appellant argues, that state regulation is permitted where
the regulated conduct touches deeply rooted interests and
"in the absence of compelling congressional direction," it
cannot be said that Congress intended to deprive states of
jurisdiction. 65 Haw. at 195, 649 P.2d at 1124 (citing
*Garmon*, 359 U.S. at 244). *Gouveia*, however, cautioned
that concurrent state-court jurisdiction is not permissible
"where a realistic threat of interference with the federal
regulatory scheme exists." *Id.* at 196, 649 P.2d at 1125.

We observe that certain state interests are implicated in a
suit for malicious prosecution, including maintaining the
integrity of the judicial system, providing injured persons
with some form of redress, and preserving an individual's
right to petition the court and to a jury trial. Malicious
prosecution may also result in substantial damages,
including punitive damages, [***36] which the NLRB
could not provide to an injured party in an unfair labor
practice proceeding. [16] *Linn*, 383 U.S. at 63-64.

[16] In their fourth argument, Appellees contend
that "any limitation of Appellant's monetary
remedies does not invalidate preemption[.]" In
any event, the cases indicate that the availability
of monetary damages can be a factor in
determining whether a state-tort claim is
preempted.

However, similar to the claims for abuse of process, the
malicious prosecution claim in this case presents a
"realistic risk of interference with the [NLRB's] primary
jurisdiction to enforce the statutory prohibition against
unfair labor practices." *Sears, 436 U.S. at 198.* In his
CAC, Appellant attributes Appellees' conduct as
motivated by a desire to retaliate against him for his
exercise of union duties, and to interfere with his
employment. These allegations directly implicate factual
conduct covered under *sections 7* and *8* of the NLRA. *See
Richardson, 966 F.2d at 158.* [***37] We hold, then,
that Appellant's claim for malicious prosecution is
preempted, and the derivative claims relating to this tort
are similarly preempted.

X.

While Appellant's claims for abuse of process and
malicious prosecution are preempted, Appellant's
remaining claims for IIED, false light invasion of
privacy, and defamation are not preempted inasmuch as
these claims, as alleged, do not present a realistic danger
of interfering with the national labor policy and fit within
the exceptions to *Garmon* as set forth in *Gouveia* and
*Briggs.*

XI.

We hold that Appellant's sixth claim for relief, IIED,
although arguably protected under the NLRA, is not
preempted. Under paragraphs 117 to 123 of the CAC,
Appellant maintains that he was retaliated against for his
union activity, thus causing him emotional distress.
Paragraphs 118 to 120 of his CAC alleged the acts giving
rise to Appellant's IIED claim, including allegations of
filing multiple TROs, transmitting false information to
other persons with the intent of causing statewide
republication, and falsely accusing Appellant of wrongful
acts such as witness intimidation, property destruction,
drug use, and the terrorizing [***38] of witnesses.

This court has addressed the issue of preemption on state-law claims for IIED. [17] In *Briggs*, it was said that "'outrageous conduct, threats, intimidation, and words' which cause a plaintiff to suffer 'grievous mental and emotional distress as well as great physical damage' may also fall within [**846] [*533] an exception to the federal interest in the national labor policy and therefore permit state law recovery." *73 Haw. at 284, 831 P.2d at 1341* (quoting *Farmer, 430 U.S. at 301*). As noted above, this court held that allegations of such conduct may survive preemption provided that certain requirements are met:

> In order for a tort claim based on outrageous conduct to survive pre-emption, the outrageous conduct must be either 1) unrelated to governed labor practices, *or* 2) be accomplished in such an abusive manner that the manner itself becomes the basis for the claim.

*Id. at 285, 831 P.2d 1335* (emphasis added).

> [17]   During the course of the underlying proceedings, the elements required for the tort of intentional infliction of emotional distress (IIED) were (1) that the act causing the harm was intentional, (2) that the act was unreasonable, and (3) that the actor should have recognized the likelihood of harm. *Wong v. Panis, 7 Haw. App. 414, 421, 772 P.2d 695, 700 (1989).* Subsequently, we have abrogated that test and established that in a claim for IIED, the elements required are "(1) that the act allegedly causing harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another." *Hac v. Univ. of Hawai'i, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003).*

[***39]

*Briggs* relied on the Supreme Court decision in *Farmer*. In *Farmer*, the Supreme Court permitted a state-law claim for IIED to proceed despite the broad application given to NLRA preemption pursuant to *Garmon*. In that case, the plaintiff alleged that union officials discriminated against him in referrals to employers following a disagreement over union policies. *430 U.S. at 292*. In holding that the IIED claim survived preemption

under *Garmon*, the Court said:

> If the charges in [the plaintiff's] complaint were filed with the [NLRB], the focus of any unfair labor practice proceeding would be on whether the statements or conduct on the part of union officials discriminated or threatened discrimination against him in employment referrals for reasons other than failure to pay union dues. Whether the statements or conduct of the respondents also caused [the plaintiff] severe emotional distress and physical injury would play no role in the [NLRB's] disposition of the case, and the [NLRB] could not award [the plaintiff] damages for pain, suffering, or medical expenses. Conversely, the state-court tort action can be adjudicated without resolution [***40] of the "merits" of the underlying labor dispute. Recovery for the tort of emotional distress under California law requires proof that the defendant intentionally engaged in outrageous conduct causing the plaintiff to sustain mental distress. *The state court need not consider, much less resolve, whether a union discriminated or threatened to discriminate against an employee in terms of employment opportunities. To the contrary, the tort action can be resolved without reference to any accommodation of the special interests of unions and members in the hiring hall context.*

*Id. at 304* (emphasis added) (citations omitted).

This court in *Briggs*, citing to *Farmer*, recognized that claims for IIED are not automatically preempted:

> Union discrimination in employment opportunities [conduct violating the NLRA] cannot itself form the underlying "outrageous" conduct on which the state-court tort action is based; to hold otherwise would undermine the pre-emption principle. Nor can threats of such discrimination suffice to sustain state-court jurisdiction. It may well be that the threat, or actuality, of employment

discrimination will cause a union [***41] member considerable emotional distress and anxiety. *But something more is required before* concurrent state-court jurisdiction can be permitted. Simply stated, it is essential that the state tort be either *unrelated* to employment discrimination *or a function of the particularly abusive manner* in which the discrimination is accomplished or threatened rather than a function of the actual or threatened discrimination itself.

*Briggs, 73 Haw. at 285, 831 P.2d at 1341* (citing *Farmer, 430 U.S. at 305*) (emphases in original). Hence, in order for Appellant to proceed with his claim for IIED, the claim must either be (1) unrelated to employment discrimination or (2) "a function of the particularly abusive manner in which the discrimination is accomplished or threatened rather then a function of the actual or threatened discrimination itself." *Id.* A review of the record in this appeal indicates that Appellant cannot succeed under the first prong since the claim for IIED, as alleged, arises in part, from union-related activity. The alleged conduct imputed by Appellant to the original defendants and Appellees occurred shortly after the disagreement [***42] over the terms of the union contract [**847] [*534] and work rules. Based on the record and the allegations contained in the CAC, it cannot be said that Appellant's claim is unrelated to employment discrimination.

However, Appellant satisfies the pleading requirements under the second prong. Appellant alleges that Appellees and defendants (1) took steps in procuring multiple TROs and "causing [a] subpoena duces tecum to be served on the Probation office in order to threaten (i) the revocation of [Appellant's] deferred acceptance of guilty plea, (ii) the entry of a guilty plea against [Appellant], (iii) the sentencing of [Appellant] to prison, or (iv) otherwise to cause [Appellant] to have difficulties with the Probation office"; (2) "directly or indirectly transmitted false information to other persons . . . with the intent of causing statewide republication of said false information"; and (3) "embarked on a campaign to falsely accuse [Appellant] of various acts including witness intimidation, property destruction, drug use, and terrorizing of 'key witnesses.'" As a matter of law, engaging in conduct designed to threaten a person's liberty and reputation in the manner alleged may [***43]

constitute particularly abusive behavior. Moreover, such conduct cannot be characterized as simply a function of employment discrimination for, under the allegations, the conduct goes beyond mere "threat, or actuality, of employment discrimination[,]", *id.*, stemming from a union-related dispute. To the extent that Appellant can show that these acts were done in a particularly abusive manner, they are outside the purview of preemption.

XII.

Appellant's fifth claim for false light invasion of privacy [18] in paragraphs 110 to 116 of the CAC, sets forth factual allegations similar to those of his claim for defamation. *See infra.* However, a cause of action for false light differs from defamation in that "it is enough that [a plaintiff] is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." *Restatement § 652E, comment b.*

[18]   The *Restatement (Second) of Torts § 652E* (1997) defines the tort of false light invasion of privacy as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

[***44] In paragraph 112, Appellant alleges that Appellees "publicized matters" relating to him, placing him "in a false light before the public," and "with reckless disregard as to the truth of the matters." Appellant further alleges in paragraph 114 that Appellees knew that the statements "were false or acted in reckless disregard of

the truth of the statements which were made[,]" and, under paragraph 116, that the making of the statements was "intentional, wilful, wanton, fraudulent, malicious and/or oppressive[.]"

The Supreme Court has not decided the question of whether the tort of false light invasion of privacy is preempted by the NLRA. In order to establish a claim for false light invasion of privacy, the plaintiff must show that defendant had "knowledge of . . . or reckless disregard as to the falsity of the publicized matter and the false light in which [the plaintiff] would be placed[,]" *Restatement § 652E*, which would be "highly offensive to a reasonable person[,]" *id.*

We observe that the issues to be decided by the NLRB in an unfair labor practice proceeding would differ from the issues to be decided by a court in a tort action for false light invasion [***45] of privacy. The NLRB would focus on the effect of such alleged acts on Appellant's association with the labor union while a state court would focus on infringement of Appellant's right to privacy. Thus, a claim for false light invasion of privacy would merely be a "peripheral concern" of the NLRA. *Gouveia, 65 Haw. at 195, 649 P.2d at 1124.* As such, this cause of action will not unduly interfere with debate in the labor context.

[**848] [*535] Moreover, we believe the interests of an individual in securing his or her privacy is a primary state concern and that a claim for false light invasion of privacy is "deeply rooted in local feeling and responsibility[.]" *Id. Cf. State v. Lester, 64 Haw. 659, 667, 649 P.2d 346, 353 (1982)* (emphasizing the scope of the right to privacy by stating that "the right-to-privacy provision of [*Article I, section 6 of the Hawai'i Constitution*] relates to privacy in the informational and personal autonomy sense," which encompasses "the common law right to privacy or tort privacy, and the ability of a person to control the privacy of information about himself such as unauthorized public disclosure of embarrassing or personal facts [***46] about himself" and that " *it concerns the possible abuses in the use of highly personal and intimate information in the hands of government or private parties* " (emphasis added) (internal citations omitted)). We therefore hold that Appellant's claim of false light invasion of privacy is not preempted by the NLRA, and was sufficiently pled.

XIII.

With respect to his fourth claim of defamation, alleged in paragraphs 103 to 109 of the CAC, Appellant in paragraph 105 avers such harm as follows:

> The statements were untrue and Defendants knew they were untrue at the time they made said representations. These accusations were false and defamatory on their face, imputed in Plaintiff an *unfitness to perform the duties of his employment or any employment, and prejudiced him in such employment and in any other employment that he might potentially seek.* It was readily foreseeable that these false and defamatory accusations caused injury to Plaintiff, including in his profession, calling, or trade.

(Emphasis added.) Appellant further asserted in paragraph 109 that Appellees' conduct was "malicious."

The harm alleged predominantly relates to Appellant's employment. [***47] This cause of action may require the court to adjudicate issues related to union animosity. Thus, Appellant's claim for defamation arguably involves activity protected under *section 7 of the NLRA*. However, the Supreme Court's examination of preemption of defamation in *Linn* is illuminative.

In *Linn*, the plaintiff company manager brought an action against the union for false and defamatory statements made in the course of the union's organizing campaign. *383 U.S. at 55.* The United States district court dismissed the complaint on the basis of preemption. *Id.* The plaintiff appealed to the Sixth Circuit, which affirmed. *Id.* The Supreme Court reversed, holding that concurrent jurisdiction was proper:

> Exercise of state jurisdiction here would be a " *merely peripheral concern of the Labor Management Relations Act,*" provided it is limited to redressing libel issued with knowledge of its falsity, or with reckless disregard of whether it was true or false. *Moreover, we believe that "an overriding state interest" in protecting its residents from malicious libels should be recognized in these circumstances.*

*Id. at 61* (emphases [***48] added). According to the

109 Haw. 520, *535; 128 P.3d 833, **848;
2006 Haw. LEXIS 70, ***48; 179 L.R.R.M. 2431

Court, in *Linn*, "a State's concern with redressing malicious libel is 'so deeply rooted in local feeling and responsibility' that it fits within the exception specifically carved out by *Garmon*." *Id. at 62*. The Court recognized that a potential conflict between state court actions for defamation and the NLRA should be resolved in favor of state jurisdiction:

> While the [NLRB] might find that an employer or union violated § 8 by deliberately making false statements, or that the issuance of malicious statements during an organizing campaign had such a profound effect on the election as to require that it be set aside, it looks only to the coercive or misleading nature of the statements rather than their defamatory quality. *The injury that the statement might cause to an individual's reputation--whether he be an employer or union official--has no relevance to the Board's function. . . .* The Board can award no damages, impose no penalty, or give any other relief to the defamed individual. *On the contrary, state remedies have been designed to compensate the victim and enable him to vindicate his* [**849] [*536] *reputation. The NLRB's lack* [***49] *of concern with the 'personal' injury caused by malicious libel, together with its inability to provide redress to the maligned party, vitiates the ordinary arguments for pre-emption.*

*Id. at 63* (emphases added). However, concerned with the perceived danger that state suits would be utilized as "weapons of economic coercion", *id. at 64*, and the potential "threat to stability of labor unions and smaller employees," *id.*, the Court directed that state remedies be limited to instances where a complainant can establish that the defamatory statements were made with malice, *i.e.*, that Appellees knew the statements were false or had a reckless disregard for their truth, *see New York Times v. Sullivan, 376 U.S. 254, 279-90, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964),* and caused actual damage. [19] *Linn, 383 U.S. at 64-65.*

[19]  In contrast to this court's holding in *Beamer v. Nishiki, 66 Haw. 572, 578-79, 670 P.2d 1264, 1271 (1983),* in order for a defamation claim to be exempt from preemption, a plaintiff is required to show malice on the part of the party attributed with the defamatory statement, without regard to the plaintiff's status as a public figure.

[***50]  The Court allowed recovery if a complainant adduces evidence as to the extent of the resulting harm which may include "general injury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or whatever form of harm would be recognized by state tort law[,]" [20] *id. at 65*, and as to "some sort of compensable harm as a prerequisite to the recovery of additional punitive damages[,]" *id. at 66.*

[20]  The United States Supreme Court in *Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966),* noted that the complaint in that case failed to allege these requirements. Nevertheless, the Court granted the plaintiff leave to amend his complaint and imposed on him the burden of supporting the allegations. *Id. at 66.*

We note that Appellant has pled, under paragraph 104, that Appellees allegedly published falsities including (1) that Appellant is a violent and dangerous individual, (2) that [***51] he is similar to a person who murdered seven people in an event of workplace violence in Honolulu in the recent past, (3) that he is similar to a person who murdered three workers, (4) that he is similar to a person who "massacred" his workplace supervisor in a Connecticut incident, (5) that he "became angry" and started an altercation with Soares, (6) that Soares did not provoke the dispute with Appellant, (7) that Appellant is associated and affiliated with, and is therefore responsible for, wrongful acts by other persons, (8) that Appellant physically attacked Lee, (9) that Appellant caused a physical altercation with police at a night club, (10) that Appellant was taking steroids, (11) that Appellant destroyed property, and (12) that Appellant physically attacked Kalaiwaa.

As required by *Linn*, Appellant has pled, under paragraph 107, that the statements "impugned [Appellant's] reputation" and "held him up to scorn and ridicule and feelings of contempt and execration in the community at large[,]" and under paragraphs 105 and 109 of the CAC, that "the statements were untrue and [Appellees] knew they were untrue at the time" and that

109 Haw. 520, *536; 128 P.3d 833, **849;
2006 Haw. LEXIS 70, ***51; 179 L.R.R.M. 2431

the statements were made with malice. [***52] Therefore, based on the allegations, Appellant's defamation claim cannot be dismissed at this point. Inasmuch as Appellant's claims for conspiracy and aiding and abetting are derivative claims, such claims are not preempted insofar as the underlying tort is not.

XIV.

As discussed *supra*, the court approved a settlement between the first and second McCabe defendants and Appellant, leaving only Appellees as defendants in this appeal. The fact that Appellees are attorneys, as opposed to employers, does not conflict with preemption. We note that the definition of "employer" in the NLRA "includes any person acting as an agent of an employer, directly or indirectly." *29 U.S.C. § 152(2).*

Appellant has alleged in the CAC that Appellees were agents of the defendants. This agency relationship is set forth in the CAC at paragraph 14:

> [**850] [*537] Plaintiff is informed and believes and alleges alternatively, that at relevant times mentioned herein, *all of the Defendants were: (a) acting as agents of each of the other Defendants*, and the acts of one were taken on behalf of the other Defendants herein, and/or (b) acting as co-conspirators of each of the other [***53] Defendants, and the acts of one were taken in furtherance of the conspiracy among the Defendants herein, and/or (c) aiding and abetting each of the other Defendants in the commission of the wrongs alleged herein; and/or (d) *were principals in a principal-agent relationship with MHJP and Pepper as agents.*

(Emphases added.) Similarly, in their motion to dismiss, Appellees acknowledged that *Garmon* preemption applies to attorneys of employers accused of unfair labor practices. As stated *supra*, the definition of "employer" in the NLRA includes agents of the employer. Hence, Appellees may raise preemption in defense to Appellant's claims. *See Richardson, 966 F.2d at 157* (stating that "third parties such as attorneys do typically act as agents of the employer, and are thus, in such cases, clearly subject to the NLRA" (internal citations omitted)).

XV.

Finally, in his third issue on appeal, Appellant argues that preemption would violate his right to a trial by jury under the *Seventh Amendment to the United States Constitution.* Appellees, in their sixth argument, contend that this issue was improperly raised. Appellant does not direct this court to [***54] an instance where this argument was directed to the court. Accordingly, we do not consider it. "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." *State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003). See, e.g., State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990)* (stating that, "generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal").

XVI.

Based on the foregoing, we affirm in part and vacate in part the October 23, 2002 final judgment of the court granting appellees' motion for summary judgment and dismissing Appellant's CAC for lack of subject matter jurisdiction and remand for further proceedings consistent with this opinion.

# EXHIBIT C



14 of 36 DOCUMENTS

**PAUL KORTHAS, Plaintiff, v. NORTHEAST FOODS, INC., AUTOMATIC ROLLS OF NEW YORK, and ROBERT BLAUVELT, Defendants.**

**5:03-CV-552 (HGM/DEP)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 18846*

**February 27, 2006, Decided**

**SUBSEQUENT HISTORY:** Related proceeding at *Korthas v. City of Auburn, 2006 U.S. Dist. LEXIS 38745 (N.D.N.Y, June 9, 2006)*

**COUNSEL:** [*1] GEORGE S. MEHALLOW, ESQ., Attorney for Plaintiff, Syracuse, New York.

THOMAS G. ERON, ESQ., BOND, SCHOENECK & KING, PLLC, Attorneys for Defendant Northeast Food, Inc., Syracuse, New York.

KATHLEEN PONTONE, ESQ., JUSTIN C. ELLER, ESQ., MILES & STOCKBRIDGE P.C., Attorneys for Defendant Northeast Foods, Inc., Baltimore, Maryland.

NORMAN J. CHIRCO, ESQ., Attorney for Defendant Robert Blauvelt, Auburn, New York.

**JUDGES:** Howard G. Munson, Senior U.S. District Judge.

**OPINION BY:** Howard G. Munson

**OPINION**

**MEMORANDUM - DECISION AND ORDER**

Plaintiff, Paul Korthas ("Korthas"), brings this complaint seeking redress for intentional infliction of emotional distress, defamation, tortious interference with contract, malicious prosecution, and false imprisonment, stemming from a dispute with his former employer, defendant, Northeast Foods, Inc. ("Northeast Foods") and a coworker, defendant Robert Blauvelt ("Blauvelt"). *See* Dkt. No. 1, Compl.; Dkt. No. 6, Am. Compl.; Dkt. No. 7, Pl.'s Mem. of Law at 2. Plaintiff filed his complaint in the Supreme Court of the County of Cayuga, State of New York against Northeast Foods, Automatic Rolls of New York ("Automatic Rolls"), a division of Northeast [*2] Foods, and Blauvelt, a non-management employee of Automatic Rolls (collectively "defendants"). Northeast Foods and Automatic Rolls removed the action to the Northern District of New York. *See* Dkt. No. 1, Notice of Removal. Currently pending before the court are: (1) defendants' motion to dismiss Korthas' complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*, or in the alternative, for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil procedure*, [1] *see* Dkt. No. 3, Notice of Mot.; and (2) Korthas' cross-motion to amend the complaint pursuant to *Rule 15(a) of the Federal Rules of Civil Procedure* and New York Civil Procedure Law and Rules *Section 3025(a)* and *(b)* or in the alternative, to remand the case to state court pursuant *28 U.S.C. § 1447(c)*. *See* Dkt. No. 6, Notice for Cross Mot. For the reasons that follow below, Korthas' motion to amend his complaint is

GRANTED, Korthas' motion to remand the case to state court is DENIED, and defendants' motion to dismiss Korthas' [*3] complaint, or in the alternative, for summary judgment is GRANTED.

> 1  Northeast Foods and Automatic Rolls filed the motion and Blauvelt joined in their motion for summary judgment and in opposition to Korthas' cross-motion. *See* Dkt. No. 11, Notice of Mot.

## BACKGROUND

Northeast Foods operated a bakery in Auburn, New York under the name Automatic Rolls, which has since been sold. Dkt. No. 5, Defs.' Statement of Material Facts at P1. Northeast Foods employed hourly workers at its Automatic Rolls facility in a bargaining unit represented by the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local 116 ("Union"), pursuant to a collective bargaining agreement ("CBA") effective from April 6, 1999, through April 6, 2004. Dkt. No. 5, Defs' Statement of Material Facts at P2. The CBA established the terms and conditions of employment for bargaining unit employees. Id. at P3. Northeast Foods employed Korthas within the bargaining unit, and consequently, while he was employed by [*4] Northeast Foods, the CBA governed the terms of Korthas' employment. *See* id. at PP4, 6. Northeast Foods discharged Korthas on March 26, 2002, after having received a report that he had threatened to physically harm certain co-workers. [2] *See* id. at P5. After he was terminated, Korthas filed a grievance with the Union. The Union, however, citing Korthas' "intimidating" and "threatening" conduct, which included, *inter alia,* threats to kill his supervisor and threats to stab co-workers, declined to pursue the grievance on his behalf. *See* id. at P7 and Ex. C. Korthas subsequently filed a Charge against Northeast Foods with the National Labor Relations Board ("NLRB"), claiming that Northeast Foods had discriminated against him on the basis of his protected union activities in violation of the National Labor Relations Act, *29 U.S.C. §§ 151-169* ("NLRA"), and the CBA by calling the Auburn Police Department ("Police"), having him removed from the bakery, and terminating his employment. *See* id. at P8. The NLRB dismissed the Charge, finding that Northeast had acted reasonably in calling the police and in terminating [*5] Korthas' employment: "the [NLRB's] investigation disclosed that [Northeast Foods] acted out of concern for the safety and welfare of its workforce after it had

received information that [Korthas had] . . . displayed a knife in a menacing fashion and after employees reported that you had made threatening statements to do harm to others." *See* id. at P9 and Ex. E. In addition, Korthas filed a Charge with the NLRB against the Union, alleging, *inter alia,* that the Union refused to pursue a grievance on his behalf regarding his termination. *See* Dkt. No. 5, Defs.' Statement of Material Facts at P10.

> 2  Korthas, while purportedly admitting this fact in the fifth paragraph of his Statement of Material Facts, apparently disputes this fact, although his denial appears in the sixth paragraph of his Statement of Material Facts. The dispute, however, is minor with Korthas submitting that Northeast Foods discharged him after he was removed from its property in handcuffs by the Auburn Police and charged with harassment. *See* Dkt. No. 8, Pl.'s Statement of Material Facts at PP5-6.

[*6] Defendants move for summary judgment arguing that Korthas' complaint setting forth alleged violations of various state laws is but an end-run around the grievance procedures outlined in the CBA as well as the procedural requirements of the NLRA. *See* Dkt. No. 4, Defs.' Mem. of Law at 2. Defendants argue that Korthas' claims must be dismissed because they are preempted and time-barred by *Section 301* of the Labor Management Relations Act ("LMRA"), *29 U.S.C. § 185(a),* and they are preempted by the NLRA. Furthermore, defendants argue that even if the state law claims are not preempted, they fail on the merits. *See* id. Korthas opposes defendants' motion and maintains that the LMRA does not preempt his state tort claims, and that with the absence of a federal question to adjudicate, the court should remand his case to the state court. *See* id. at 3.

## DISCUSSION

### I. Plaintiff's Cross-Motion to Amend the Complaint

*Rule 15(a) of the Federal Rules of Civil Procedure* provides that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served [*7] . . . . Otherwise a party may amend the party's pleading by leave of the court . . . and leave shall be freely given when justice so requires." *FED.R.CIV.P. 15(a). Rule 15(a)* affords the court discretion to grant or deny a motion to amend a

2006 U.S. Dist. LEXIS 18846, *7

complaint, *see New York State NOW v. Cuomo, 182 F.R.D. 30, 36 (S.D.N.Y.1998)*, but "there must be good reason to deny the motion." *Acito v. Imcera Group, Inc., 47 F.3d 47, 55 (2d Cir.1995)* (citation omitted).

Here, defendants appear to direct their opposition not toward Korthas' motion to amend his complaint, but rather toward Korthas' request to remand the case to state court. In Korthas' amended complaint, the court observed only minor modifications to the original complaint, and the court can detect no undue prejudice to defendants by permitting Korthas to amend his complaint. Based upon these considerations, the court GRANTS Korthas' cross-motion to amend his complaint.

## II. Motion to Dismiss

When matters outside the pleadings are presented in connection with a motion pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* [*8] , the court must, with the exception of certain narrowly-defined materials, either exclude the additional material and decide the motion on the complaint alone, or convert the motion to one for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* and afford all parties a "reasonable opportunity to present all material made pertinent to such a motion by *Rule 56.*" *FED.R.CIV. P. 12(b); see also Friedl v. City of New York, 210 F. 3d 79, 83 (2d Cir. 2000)*. The Second Circuit strictly enforces "the conversion requirement of *Rule 12(b)(6)* where there is a legitimate possibility that the district court relied on inappropriate material in granting the motion." *Amaker v. Weiner, 179 F.3d 48, 50 (2d Cir. 1999)*. The conversion requirement's purpose is to ensure that "courts will refrain from engaging in fact-finding when considering a motion to dismiss, and also that plaintiffs are given a fair chance to contest defendants' evidentiary assertions." *Amaker, 179 F.3d at 50*.

It appears that defendants drafted their motion as one seeking summary [*9] judgment, including various materials outside the complaint, and that plaintiff tailored his opposition to defeat a motion for summary judgment. Accordingly, the court will analyze defendants' motion as one seeking summary judgment.

## III. Summary Judgment Standard

The standard for summary judgment is familiar and well-settled. *Rule 56* allows for summary judgment where the evidence demonstrates that "there is no genuine issue

of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)*. Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L. Ed. 2d 265 (1991)* (quoting *FED.R.CIV.P. 1*). A court may grant a motion for summary judgment when the moving party carries its burden of showing that no triable issues of fact exist. *See Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990)*. [*10] In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See Thompson, 896 F.2d at 720; United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L. Ed. 2d 176 (1962)* (per curiam). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *FED.R.CIV.P. 56(e)*. The role of the court on a motion for summary judgment is not to try issues of fact but only to determine whether there are issues of fact to be tried. *See, e.g., Anderson, 477 U.S. at 255, 106 S.Ct. at 2513; Gallo v. Prudential Residential Services, Limited Partnership, 22 F.3d 1219, 1223-24 (2d Cir.1994); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir.1987)*. The drawing of inferences and the assessment of the credibility of the witnesses remain within the province of the finders of fact. To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show [*11] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L. Ed. 2d 538 (1986)*. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson, 477 U.S. at 248, 106 S. Ct. at 2510*. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *See Anderson, 477 U.S. at 250-251, 106 S.Ct. at 2511*.

## IV. Federal Subject Matter Jurisdiction and Preemption

### A. Well-Pleaded Complaint

Korthas raised only state law claims in both his state court and amended complaints. As a general rule, a suit

seeking recovery under state law is not transformed into a suit "arising under" federal law merely because, to resolve it, the court may need to interpret federal law. *See Caterpillar, Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429-30, 96 L.Ed.2d 318 (1987)* (explaining that in the context of removal, only state court actions that could have been filed in federal court in the first [*12] instance may be removed to federal court); *Gully v. First Nat'l Bank, 299 U.S. 109, 115, 57 S.Ct. 96, 81 L.Ed. 70 (1936)* ("Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit."). This principle informs the "well-pleaded-complaint rule," which prescribes that federal subject-matter jurisdiction can be founded only on those allegations in a complaint that are "well pleaded." *Sullivan v. American Airlines, Inc., 424 F.3d 267, 271 (2d 2005)* (citing *Rivet v. Regions Bank of La., 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998))*; *Caterpillar, 482 U.S. at 392, 107 S.Ct. 2425*. Under the "well-pleaded complaint rule," the plaintiff is the "master of the claim," in that he or she may avoid federal jurisdiction by exclusive reliance on state law in drafting his or her claims. *Caterpillar, 482 U.S. at 392, 107 S.Ct. 2425*; *see also Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 809, n. 6, 106 S.Ct. 3229, 3233, 92 L.Ed.2d 650 (1986)* ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced."). While [*13] federal preemption may be raised as a defense to allegations set forth in a plaintiff's well-pleaded complaint, *Caterpillar, 482 U.S. at 392, 107 S.Ct. 2425*, it is well settled that "[a] case may not be removed to federal court on the basis of a defense of federal preemption, even if the defense is anticipated in the complaint, and even if preemption is the only issue in the case." *Foy v. Pratt & Whitney Group, 127 F.3d 229, 232 (2d Cir.1997)* (citation omitted). "The well-pleaded-complaint rule mandates that in assessing subject-matter jurisdiction, a federal court must disregard allegations that a well-pleaded complaint would not include-e.g., allegations about anticipated defenses." *Sullivan, 424 F.3d at 271* (citing *Rivet, 522 U.S. at 475, 118 S.Ct. 921* ("A defense is not part of a plaintiff's properly pleaded statement of his or her claim.")). Therefore, a plaintiff's complaint's mere allegation that the defendant's (anticipated) federal defense should fail is insufficient to create federal subject-matter jurisdiction. Id. (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 14, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983))*. [*14]

*B. Artful Pleading*

"While the well-pleaded-complaint rule directs federal courts to disregard certain elements of a complaint in assessing federal subject-matter jurisdiction, federal courts sometimes do the inverse: read into a complaint elements that the plaintiff omitted." Id. "The artful-pleading doctrine, a corollary to the well-pleaded-complaint rule, rests on the principle that a plaintiff may not defeat federal subject-matter jurisdiction by 'artfully pleading' his complaint as if it arises under state law where the plaintiff's suit is, in essence, based on federal law." Id. (citations omitted). When confronted with such an artfully (*i.e.*, misleadingly) pleaded complaint, the court may construe the complaint as if it raised the federal claim that actually underlies the plaintiff's suit. Id. (citing *Rivet, 522 U.S. at 475, 118 S.Ct. 921*).

The artful-pleading doctrine includes within it the doctrine of complete preemption. Id. (citing *Rivet, 522 U.S. at 475, 118 S.Ct. 921* ("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim.")). Where the preemptive force [*15] of a federal statute is so extraordinary that it effectively "converts an ordinary state law common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule," *Caterpillar, 482 U.S. at 393, 107 S.Ct. 2425*, a removing party may invoke the complete preemption doctrine. "When a plaintiff raises such a completely preempted state-law claim in his complaint, a court is obligated to construe the complaint as raising a federal claim and therefore 'arising under' federal law." *Sullivan, 424 F.3d at 272* (footnote omitted). The Supreme Court has found that only three statutes have the requisite extraordinary preemptive force to support complete preemption, including *§ 301 of the LMRA. See Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8, 123 S.Ct. 2058, 2063, 156 L.Ed.2d 1 (2003); Caterpillar, 482 U.S. at 393-94, 107 S.Ct. 2425; Avco Corp. v. Aero Lodge No. 735,390 U.S. 557, 558-62, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)*.

*C. Preemption under Section 301 of the LMRA*

Section 301 of the LMRA provides: "suits for violation of contracts between an employer and a labor organization [*16] representing employees . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." *29 U.S.C. § 185(a)*. Reasoning that "'state law

does not exist as an independent source of private rights to enforce collective bargaining contracts,'" the Supreme Court has recognized that where a clause in the CBA lies at the "heart of the state-law complaint," that complaint arises under federal law. *Caterpillar, 482 U.S. at 394* (quoting *Avco Corp. v. Machinists, 376 F.2d 337, 340 (6th Cir. 1967)*. "If even one claim is subject to the complete preemption doctrine, then federal jurisdiction exists over that claim, supplemental jurisdiction exists over the others (unless those claims 'substantially predominate over the claim or claims over which the district court has original jurisdiction,' *28 U.S.C. § 1367(c)(2)*), and the case may remain in federal court." *Meier v. Premier Wine & Spirits, Inc., 371 F.Supp.2d 239, 245-46 (E.D.N.Y. 2005)*.

*Section 301* preemptively governs [*17] claims "founded directly on rights created by [CBAs], and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar, 482 U.S. at 394* (quoting *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985)*; *Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988)* ("If the resolution of a state-law claim depends upon the meaning of a [CBA], the application of state law . . . is pre-empted . . . ."). *Section 301* preempts a plaintiff's state-law claims where "evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." *Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. 1904*. In other words, "'where the resolution of the state law claim depends on an *interpretation* of the collective bargaining agreement,'" the LMRA preempts that claim, *Foy, 127 F.3d at 233* (quoting *Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 260-62, 114 S.Ct. 2239, 2248, 129 L.Ed.2d 203 (1994))*, including claims "alleging liability in tort. [*18]  " *Allis-Chalmers, 471 U.S. at 211, 105 S.Ct. at 1911*. However, "the bare fact that a [CBA] will be consulted in the course of the state-law litigation plainly does not require that the claim be extinguished. *Foy, 127 F.3d at 233* (quoting *Livadas v. Bradshaw, 512 U.S. 107, 124, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994))*; *Alcantara v. Allied Properties, LLC, 334 F.Supp.2d 336, 340-43 (E.D.N.Y. 2004)* (explaining that "when the nature of the dispute is fact-intensive, the review of the [CBA] is not an "interpretation" requiring preemption). The Second Circuit Court of Appeals has allowed that the "boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be

'consulted' is elusive." *Vera v. Saks & Co., 335 F.3d 109, 115 (2d Cir. 2003)*.

To determine whether the LMRA preempts Korthas' claims, the court "begin[s] with the elements of . . . plaintiff's state law claim[s]." *Foy, 127 F.3d at 233* (citing *Lingle, 486 U.S. at 405-06, 108 S.Ct. at 1881*). In the instant case, Korthas' complaint sets forth five causes of [*19] action under New York State Law: (1) intentional infliction of emotional distress; (2) defamation; (3) tortious interference with contract; (4) malicious prosecution; and (5) false imprisonment.

### D. Preemption and Korthas' Claims

#### 1. Intentional Infliction of Emotional Distress

As his first cause of action, Korthas alleges that defendants "falsely and wrongfully" caused his arrest and that they "acted willfully, maliciously . . . and in wanton disregard" of his rights. Dkt. No. 6, Am. Compl. at P18. To state a claim of intentional infliction of emotional distress, a plaintiff must establish: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996)*. Whether defendants' conduct in investigating and reporting Korthas' actions and terminating him for such action requires the court to construe Northeast Foods' rights and duties under the CBA. A determination of whether defendants' alleged conduct constitutes extreme and outrageous conduct "depends upon whether defendants' conduct was prohibited [*20] or condoned by the terms of the collective bargaining agreement." *Seaver v. Yellow Freight System, Inc., 1996 U.S. Dist. LEXIS 15915, 1996 WL 622639, at *4-*5 (W.D.N.Y. Aug. 22, 1996)* (claim for intentional infliction of emotional distress preempted by § 301 where determination of whether conduct was "outrageous" or "extreme" depended upon whether defendants' conduct was prohibited by the "just cause" provision of the CBA).

The CBA at bar addresses Northeast Foods' rights and duties with respect to disciplining its employees and resolving employment disputes. Specifically, the CBA provides that Northeast Foods "shall not discharge or suspend any Employee who has completed his probationary period without just cause." Dkt. No. 5, Ex. B at 12. The CBA also vests in Northeast Foods, *inter alia,* the right to "formulate and enforce plant rules and

regulations," and the right to "suspend, . . . demote, . . . discharge and relieve employees from duty because of . . . legitimate reasons." Id. Ex. B at 18. The CBA provides that Northeast Foods "shall have the right to discharge or discipline any employee for just cause, such as *but not limited to:* dishonesty, smoking (except in authorized [*21] areas), intoxication, drinking or gambling on [Northeast Foods'] premises, or direct refusal to obey orders by [Northeast Foods]." Dkt. No. 5, Ex. B at 18 (emphasis added). Moreover, the CBA requires employees

> to comply with all Federal, State and Local Safety and Health Regulations brought to their attention and implemented by [Northeast Foods]. Refusal to comply and cooperate on the part of any employee shall be cause for disciplinary action up to dismissal . . . [Northeast Foods] reserves the right to formulate and effectuate rules for the conduct of employees which are not inconsistent with the [CBA].

Id. Ex. B at 14. Finally, the CBA invests in Northeast Foods a parallel duty to provide its employees with a safe work environment. The tenor of the CBA is to ensure "industrial peace" and to that effect, the parties to the CBA recognized that "without mutual understanding, harmony and cooperation among employees and between employees and employer, it is impossible to operate a bakery business with the economy and efficiency indispensable to its' [sic] existence and to the best interests of its' [sic] employees." Id. Ex. B at 3.

The court concludes [*22] that Korthas' intentional infliction of emotional distress claim as to Northeast Foods is inextricably intertwined with the CBA such that an interpretation of the CBA is required. The allegedly outrageous conduct, Northeast Foods' investigating and reporting Korthas' conduct to the Police, was condoned by the CBA, which authorizes Northeast Foods to discipline or discharge its employees for legitimate reasons or just cause, and requires cooperation between employees. As to Blauvelt, in reporting to his superiors Korthas' threats, he acted in a manner consistent with the CBA's objectives of industrial peace and harmony among employees; however, the CBA apparently imposed no duty upon Blauvelt to report the incident and thus the court finds that resolution of the intentional infliction of emotional distress claim is not substantially dependent on

analysis of the CBA.

Therefore, Korthas' intentional infliction of emotional distress claim as to Northeast Foods is preempted by *§ 301 of the LMRA. See Scott v. Machinists Auto. Trades District Lodge No. 190 of Northern California, 827 F.2d 589, 594 (9th Cir. 1987)* ("State tort claims for intentional infliction of emotional [*23] distress are preempted when they arise out of the employee's discharge or the conduct of the defendants in the investigatory proceedings leading up to the discharge."); *Heaning v. Nynex-New York, 945 F.Supp. 640, 646 (S.D.N.Y. 1996)* ("Because the allegedly outrageous conduct in this instance was defendant's breach of a duty arising under the CBA, preemption applies whether plaintiff formulates his claim as one for breach of contract or for the intentional infliction of emotional distress."); *Sherwin v. Indianapolis Colts, Inc., 752 F.Supp. 1172, 1178-79 (N.D.N.Y. 1990)* (explaining that plaintiffs' claim for intentional infliction of emotional distress was "substantially dependent" upon the CBA and therefore preempted. As to Blauvelt, the court exercises its supplemental jurisdiction, *see infra,* over the claim. *See Meier, 371 F.Supp.2d at 245-46.* Although the court need not proceed any further, *see id.,* the court continues its analysis.

2. Defamation

As his second cause of action, Korthas alleges that "upon information and belief, plaintiff was alleged by the defendants to have threatened . . . Blauvelt with [sic] [*24] pocket knife." Dkt. No. 6, Am. Compl. at P22. Korthas alleges that as a result of defendants' conduct, the Police arrested and detained him and Northeast Foods terminated his employment. Id. at P24. Korthas' amended complaint omits who made the allegedly defamatory comment, to whom the comment was made, and the context in which it was made. In New York, to prevail on a claim for defamation, a plaintiff must establish the following elements: "(1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published [without privilege, *see Matthews v. Malkus, 377 F.Supp.2d 350, 357 (S.D.N.Y. 2005)* (citation omitted)] to a third party by the defendant; and (4) resulting in injury to the plaintiff." *Marinaccio v. Boardman, 2005 U.S. Dist. LEXIS 42417, 2005 WL 928631, at *26 (N.D.N.Y. Apr. 19, 2005)* (citation omitted). "The gravamen of an action alleging defamation is an injury to reputation." *Celle v. Filipino Reporter Enters., 209 F.3d 163, 177 (2d Cir. 2000).* "[A]

defamatory statement . . . exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . [*25] . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" *Celle, 209 F.3d at 177* (citing *Kimmerle v. New York Evening Journal, 262 N.Y. 99, 186 N.E. 217, 218 (1933); Golub v. Enquirer/Star Group, Inc., 89 N.Y.2d 1074, 659 N.Y.S.2d 836, 681 N.E.2d 1282, 1283 (1997)).*

Here, the third element, publication to a third party by the defendant, implicates the manner in which Northeast Foods responded to Korthas' conduct. In examining Northeast Foods' response to Korthas' conduct, the court must assess Northeast Foods' duties and obligations under the CBA. As noted above, the CBA vests in Northeast Foods various duties and rights including the duty to not discharge an employee without just cause" and the right to "discharge and relieve employees from duty because of . . . legitimate reasons." Dkt. No. 5, Ex. B at 18. Moreover, the CBA invests in Northeast Foods a duty to provide its employees with a safe work environment, while employees are required to "comply with all Federal, State and Local Safety and Health Regulations." The tenor of [*26] the CBA is to ensure "industrial peace."

In light of these rights and duties, the court concludes that Korthas' defamation claim is inextricably intertwined with the CBA. The CBA authorized Northeast Foods to make the statement attributed to it by Korthas to, the court presumes, the Police, Korthas and Korthas' Union. Upon learning from Blauvelt of Korthas' threats, Northeast Foods opted to relieve him from duty for a legitimate reason and terminate him for just cause. As to the alleged defamatory statement made to Korthas and/or Korthas' Union, the CBA required Northeast Foods to articulate the legitimate reason and just cause for its disciplinary actions. *See* Dkt. No. 5, Ex B at 12; Ex. B at 18. The court concludes that whether Northeast Foods articulated legitimate reasons and just cause consistent with the CBA requires not mere consultation with the CBA, but rather an interpretation of the CBA. In addition, as to the alleged defamatory statement made to the Police, the CBA imposes a duty upon Northeast Foods to provide its employees with a safe work environment and to ensure industrial peace. Given that the alleged threats involved a knife, Northeast Foods' resort to calling [*27] the Police seems reasonable, if not

prudent, but surely consistent with Northeast Foods' duties as proscribed by the CBA. Consequently, whether Northeast Foods' reporting Korthas' actions to the Police requires an interpretation of the CBA. As to Blauvelt, in reporting to his superiors Korthas' threats, he acted in a manner consistent with the CBA's objectives of industrial peace and harmony among employees. The court, however, finds that resolution of the defamation claim is not substantially dependent on analysis of the CBA.

Korthas' defamation claim is preempted by *§ 301 of the LMRA* as to Northeast Foods. *Cf. Stafford v. TrueTemper Sports, 123 F.3d 291, 296 (5th Cir. 1997)* (holding state law defamation claims preempted under *§ 301* where alleged defamatory statements were made in connection with investigation into appropriateness of dismissal under labor contract); *Bagley v. General Motors Corp., 976 F.2d 919, 921 (5th Cir.1992)* (noting that holding a company liable for defamation based on statements made in connection with internal investigation and suspension procedures would render a company unable to ever undertake such investigation). [*28] "In situations where, as here, the labor contract imposes a duty upon the defendant to make the statements that are alleged to be defamatory, courts have repeatedly held that plaintiff's defamation claims are pre-empted." *Caci v. Laborers Intern. Union of North America, 2000 U.S. Dist. LEXIS 4876, 2000 WL 387599, at *3 (W.D.N.Y. Mar. 31, 2000)* (citing *Johnson v. Anheuser Busch, Inc., 876 F.2d 620 (8th Cir. 1989); Peek v. Philadelphia Coca-Cola Bottling Co., 1997 U.S. Dist. LEXIS 10138, 1997 WL 399379 (E.D.Pa. Jul. 10, 1997)* (finding claims preempted where allegedly defamatory statements "overwhelmingly related to conduct that formed the substance of plaintiff's grievance and arbitration proceedings")). As to Blauvelt, the court exercises its supplemental jurisdiction, *see infra*, over the claim. *See Meier, 371 F.Supp.2d at 245-46.*

3. Tortious Interference with Contract

As his third cause of action, Korthas asserts a claim of tortious interference with contract. Korthas confines his allegations to Blauvelt alleging that "Blauvelt had knowledge of the . . . contractual relationship between [Korthas] and Automatic Rolls . . . [, and that] Blauvelt intentionally [*29] and willfully interfered with said contract by improper means," which caused his termination. Dkt. No 6, Am. Compl. at PP27-29. The elements of a tortious interference with contract claim are

well established: "the existence of a valid contract, the tortfeasor's knowledge of the contract and intentional interference with it, the resulting breach and damages." *Hoag v. Chancellor, Inc.*, 246 A.D.2d 224, 228, 677 N.Y.S.2d 531, 533 (1st Dep't 1998); *see also Anderson v. Aset Corp.*, 329 F.Supp.2d 380, 382 (W.D.N.Y. 2004) (explaining that to prevail on a claim for tortious interference with contract, "a plaintiff must show: "(1) the existence of a valid contract between himself and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional inducement of the third party to breach that contract, and (4) damages."), *aff'd* 416 F.3d 170.

To prove his claim, Korthas would have to show that the CBA is valid, that Blauvelt induced (or conspired to induce) Northeast Foods to breach his employment contract-the CBA, and that the CBA was breached. As explained in Cespuglio v. Ward,

> A tortious interference [*30] with contract claim, by necessity, presumes a breach of contract. An adjudication of the tort claim therefore requires the court to inquire about that breach-what duties did the contract create? Did the parties to the contract fulfill those duties? If not, was the failure of one side to fulfill its duty caused by the defendant? It is hard to imagine a situation where a claim for tortious interference with a [CBA] will not implicate the provisions of that agreement. Accordingly, Cespuglio's claim-though framed as a state law claim for tortious interference with contract-is really a claim under *section 301*, and federal jurisdiction is proper.

*2004 U.S. Dist. LEXIS 8586, 2004 WL 1088235, at *4 (S.D.N.Y. May 13, 2004)* (footnote omitted); *see also Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir.1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of breach of a contract without proving that the underlying contract has been breached."); *Meier, 371 F.Supp.2d at 246* (finding plaintiff's tortious interference with contract claim completely preempted by *§ 301 of the LMRA* where the only employment contract [*31] between plaintiff and defendant was a CBA); *Amendolare v. Schenkers International Forwarders, Inc.*, 747 F. Supp. 162, 172

*(E.D.N.Y. 1990)* (claims for, *inter alia*, breach of contract and tortious interference with contract preempted by *§ 301* of theLMRA); *Dragone v. M.J. Raynes, Inc.*, 695 F.Supp. 720, 723-724 (S.D.N.Y. 1988) (holding that union member's tortious interference with contract claim for discharge implicated CBA and was therefore preempted because plaintiff "must prove that the Agreement was valid and that the Agreement was breached"). Accordingly, resolution of Korthas' claims would require interpretation of the CBA, and those claims as to all defendants are therefore preempted by *§ 301 of the LMRA. See Aset Corp. 329 F.Supp.2d at 382-83.*

### 4. Malicious Prosecution

As his fourth cause of action, Korthas asserts that he was "charged with harassment by actions of the defendants" but was not convicted. Korthas alleges, "upon information and belief," that defendants "knew that there was no reasonable belief that [Korthas] had threatened anyone" and that "defendants acted with malice toward [Korthas] having him arrested. [*32] " Dkt. No. 6, Am. Compl. at PP31-34. Korthas asserts that the "criminal charge was dismissed on the merits on May 20, 2002." Id. at P32A. Additionally, Korthas alleged that "upon information and belief, Northeast Foods, Inc., through its agents, did place an emergency call to the Auburn Police Department alleging that [Korthas] was threatening co-workers with a pocket knife." Korthas asserts that his prosecution for harassment was caused by the actions of Blauvelt, *see* id. at P16, who apparently received help from the Automatic Rolls management and who signed the information. *See* Dkt. No. 7, Pl.'s Mem. of Law at 2-3; Dkt. No. 9, Korthas Aff. at Ex. A.

To sustain a claim for malicious prosecution, a plaintiff must prove: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995). The first two elements do not require an interpretation of the CBA as to any defendant. Korthas must prove that defendants did not [*33] have knowledge of sufficient facts to support probable cause for a harassment complaint, and that they made the complaint with actual malice.

Proof of Blauvelt's subjective knowledge and motive does not require an interpretation of the CBA and

Korthas' claim for malicious prosecution against Blauvelt is not preempted by the LMRA. *See Foy v. Giant Food, Inc., 298 F.3d 284, 289 (4th Cir. 2002)*. Thus, as to Blauvelt, the court exercises its supplemental jurisdiction, *see infra*, over the claim. *See Meier, 371 F.Supp.2d at 245-46*. The same, however, cannot be said of Korthas' claim as to Northeast Foods.

Although Northeast Foods did not initiate the harassment complaint against him, Korthas maintains that Northeast Foods is liable for malicious prosecution because it rendered assistance to Blauvelt in effecting the harassment charge. The court assumes *arguendo* that Korthas' allegations suggest that Northeast Foods voluntarily aided or participated in the prosecution of the harassment assault complaint. In assuming *arguendo* that Northeast Foods aided or participated in the prosecution, however, the court can only conclude the malicious [*34] prosecution claim against Northeast Foods would be preempted by the LMRA because proof that Northeast Foods acted with malice would require interpreting the CBA. The Second Circuit defines malice for purposes of a malicious prosecution claim as a "wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth, 82 F.3d at 573* (quoting *Nardelli v. Stamberg, 44 N.Y.2d 500, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975 (1978))*. Northeast Foods could not act with an improper motive if it was authorized by the CBA to contact the Police or discharge or otherwise discipline Korthas as a result of the harassment complaint. Ascertaining whether Northeast Foods was so authorized requires an interpretation of the CBA and Korthas' malicious prosecution claim as to Northeast Foods is preempted by *§ 301 of the LMRA*.

5. False Imprisonment

As his fifth cause of action, Korthas alleges that defendants "had [him] confined first at [Automatic Rolls'] office and then at Police headquarters" and "was not allowed to leave either location," that he was "handcuffed the entire time," and that the handcuffs were tightened such that he suffered [*35] physical injury. Dkt. No 6, Am. Compl. at PP37-40. "Under New York law, the elements of a false imprisonment [or false arrest] claim are: (1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged . . . A favorable termination of the proceedings is not an

element of this tort. *Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996)* (citations, internal quotation marks and emphasis omitted).

Based upon his allegations, the court can only conclude: (1) that Korthas attributes liability to Blauvelt because of his reporting the threat to his superiors and (2) that Korthas attributes liability to Northeast Foods because it called the Police upon learning of the threat. As an initial observation, the court agrees with defendant's argument that Korthas' allegations suggest that his false imprisonment claim properly lies against the Police who were responsible for Korthas' confinement and handcuffing. Nonetheless, to any extent Korthas has asserted a false imprisonment claim against defendants, the court finds that proof of [*36] defendants' intent to confine him and proof that he was aware of and did not consent to the confinement would not require an interpretation of the CBA. Whether the alleged confinement was privileged, however, requires an interpretation of the CBA in light of Northeast Foods' duty to provide its employees with a safe work environment and to ensure industrial peace. Therefore, *§ 301 of the LMRA* preempts Korthas' false imprisonment claim as to Northeast Foods. As to Blauvelt, however, the court finds that resolution of the false imprisonment claim is not substantially dependent on analysis of the CBA, and consequently the court exercises its supplemental jurisdiction, *see infra*, over the claim.

6. Additional Considerations

The injuries Korthas allegedly suffered and the relief he seeks also indicate that his claims require an interpretation of the CBA, and arguably reveal his third attempt to challenge the legitimacy of his discharge. In his second and third causes of action, Korthas claims that the alleged defamation and tortious interference with contract *caused* his termination. *See* Dkt. No 6, Am. Compl. at PP24, 29. Furthermore, in his prayer for relief, Korthas requests [*37] compensation for, *inter alia*, lost wages and benefits. *See id.* at P42. These alleged injuries and damages are easily traced to Northeast Foods' termination of Korthas' employment, which he has already twice unsuccessfully challenged. Korthas argues that he "commenced this action seeking redress not for [his] termination but for the malicious prosecution and other intentional torts committed against him by . . . Blauvelt with the apparent help from Automatic Rolls management." *See* Dkt. No. 7, Pl.'s Mem. of Law at 2.

Korthas' complaint, however, "says what it says, and a memorandum of law is not a proper vehicle for rewriting or amending the complaint." *Aset Corp., 329 F.Supp.2d at 383* (citing *Dawson v. Bumble & Bumble, 246 F.Supp.2d 301, 316 (S.D.N.Y.2003)* ("Dawson's purported clarification effectively endeavors to rewrite or amend the Complaint through his opposition brief, a procedure not permitted by the Federal Rules").

*E. Korthas' Claims are Time-Barred under § 301*

Having found all of Korthas' claims as to Northeast Foods preempted by *§ 301 of the LMRA,* the court turns to the applicable statute of limitations. Section 301 [*38] does not contain a statute of limitations period. *Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel, 145 F.3d 85, 88 (2d Cir.1998); see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 697-98, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966).* "Because there is no statute of limitations prescribed under *§ 301,* courts typically apply the most closely analogous state statute of limitations to § 301 claims." *United States. Aerospace and Agric. Implement Workers of America, Local 33, v. R.E. Dietz Co., 996 F.2d 592, 596 (2d Cir. 1993)* (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 704-05, 86 S.Ct. 1107, 1113, 16 L.Ed.2d 192 (1966)).* Defendants argue that pursuant to R.E. Dietz Co., a six-month statute of limitations applies and the court agrees. R.E. Dietz Co. explains that the statute of limitations for "hybrid" claims involving allegations against both the employer and employee's union or claims against the employer where the relevant CBA contains an arbitration clause [*39] is six months. *See R.E. Dietz Co., 996 F.2d at 596* (explaining that after the Supreme Court's decision in *Del Costello v. International Bhd. of Teamsters, 462 U.S. 151, 172, 103 S.Ct. 2281, 2294-95, 76 L.Ed.2d 476 (1982),* the Second Circuit held in *McKee v. Transco Products, Inc., 874 F.2d 83, 85-86 (2d Cir.1989)* that the mere presence of an arbitration clause is sufficient to render an employee's claim a hybrid claim and subject it to the six-month statute of limitations).

Although Korthas filed charges with the NLRB, against both Northeast Foods and his Union, here he limited his claims to Northeast Foods. The CBA at issue, however, contains an arbitration clause at Article IX, *see* Dkt. No 5, Ex. B, whereby the court defines Korthas'

allegations as a hybrid claim. *McKee, 874 F.2d 85-86.* The claims set forth in Korthas' complaint arose on March 26, 2002; therefore, Korthas had until September 26, 2002, to file his complaint. Korthas, however, did not file his complaint in state court until March 20, 2003. Therefore, because all of Korthas' claims as to Northeast Foods are preempted by *§ 301 of the LMRA,* [*40] they are also time-barred by the applicable six-month statute of limitations. Summary judgment is GRANTED as to Northeast Foods' § 301 LMRA preemption argument and Korthas' claims are hereby DISMISSED.

**V. Plaintiff's Claims Under the NLRA**

Defendants also argue that Korthas' claims are preempted by the NLRA. The NLRA, which governs labor-management relations in the private sector, contains no express preemption provision. *Bldg. & Const. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993)* ("Boston Harbor"). Nonetheless, in 1986 the Supreme Court declared, "it is by now a commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations." *Wisconsin Dep't of Indus. v. Gould Inc., 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986).* This is consistent with the presumption under the *Supremacy Clause* "in favor of preemption in fields that are inherently federal in character and that the states have not traditionally occupied." *Drake v. Laboratory Corp. of America Holdings, 290 F.Supp.2d 352, 363-64 (E.D.N.Y.2003)* [*41] (citing *Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 347, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)).* Two distinct lines of preemption jurisprudence have emerged under the NLRA, but in the case at bar, the court need only examine one such line.

The first line of NLRA preemption, Garmon [3] preemption, "developed from a line of cases that focused on the primary jurisdiction of the NLRB." *New England Health Care, Employees Union, District 1199, SEIU/AFL-CIO v. Rowland, 221 F. Supp. 2d 297, 324 (D.Conn. 2002)* (citation omitted). It "corresponds to the actual conflict category of general preemption theory[.]" *Aeroground, Inc. v. City and County of San Francisco, 170 F.Supp.2d 950, 955 (N.D.Cal. 2001)* (citation omitted). "*Sections 7* [4] and *8* [5] of the [NRLA] regulate 'concerted activities' and 'unfair labor practices,' respectively, seeking to protect the former and stamp out the latter." *Building Trades Employers' Ass'n v.*

*McGowan, 311 F.3d 501, 508 (2d Cir.2002)* (citing *29 U.S.C. §§ 157, 158* (codifying *§ 7* and *§ 8 of the NLRA*)) (footnotes added). "'Garmon pre-emption, [\*42] ' . . . forbids state and local regulation of activities that are 'protected by *§ 7* of the [NLRA],' or constitute an unfair labor practice under *§ 8*." *Boston Harbor, 507 U.S. at 224, 113 S.Ct. at 1194* (internal quotation marks and citations omitted). Garmon preemption is relatively broad in that it "prohibits regulation even of activities that the NLRA only arguably protects or prohibits." Id. (citation omitted). The purpose of Garmon preemption is "to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' integrated scheme of regulation, . . . embodied in *§§ 7* and *8* of the NLRA, which includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the Act." *Boston Harbor, 507 U.S. at 225, 113 S.Ct. at 1194-95* (internal quotation marks and citations omitted). There are, however, two exceptions to Garmon preemption: (1) "where the activity regulated was a merely peripheral concern of the [LMRA]" and (2) "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional [\*43] direction, [it] could not be inferred that Congress had the States of the power to act." *Garmon 359 U.S. at 244, 79 S. Ct. at 779, 3 L. Ed. 2d at 782* . These exceptions underscore the court's responsibility "to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Farmer v. United Bhd. of Carpenters & Joiners of America, Local 25, 430 U.S. 290, 297, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).*

3   *San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 246, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959).*
4   Section 7 of the NLRA enumerates the "right of employees as to organization, collective bargaining, etc." *29 U.S.C. § 157.* It reads as follows:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other

mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in *section 158(a)(3)* of this title.

Id.
[\*44]
5   *Section 7 of the NLRA* provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

*29 U.S.C. § 158(c).*

In his charge to the NLRB, Korthas alleged that Northeast Foods called the Police, had him removed from company property, and terminated his employment "because he engaged in protected concerted activity, including expressing objections to the new owners retaining the predecessor's supervisors who treat employees unfairly." Dkt. No. 5, at Ex. D. In its response, the NLRB limited its focus to the alleged "protected concerted . . . union activity" and concluded that rather than retaliating for such protected union activity, Northeast Foods "acted out of concern for the safety and welfare of its workforce after it had received information that [Korthas was] displaying a knife in [\*45] a menacing fashion and after employees reported that [Korthas] had made threatening statements to do harm to others." Dkt. No. 5, at Ex. E. Clearly, the NLRB addressed the facts underlying Korthas' common law tort claims in its dismissal of Korthas' Charge, but it did not address those facts in the context of Korthas' intentional infliction of emotional distress, defamation, malicious prosecution and false imprisonment claims. The Ninth Circuit recently cautioned in *Radcliffe v. Rainbow Construction, 254 F.3d 772, 785 (9th Cir. 2001)*, that

"false arrest, false imprisonment, and malicious prosecution are similar to torts of threatened violence, traditionally held not to be preempted, or intentional infliction of emotional distress, and defamation, both of which the Supreme Court has held to be excepted from Garmon's preemption rule even though they involve conduct arguably protected or prohibited by the NLRA." *Moore v. City of New York, 219 F.Supp.2d 335, 338 (E.D.N.Y. 2002)*. Korthas' claims for intentional infliction of emotional distress, defamation, malicious prosecution and false imprisonment touch upon areas historically governed by local law [*46] and are excepted from Garmon's preemption rule; accordingly, summary judgment is DENIED with respect to those claims.

The court, however, agrees with defendants that the NLRA preempts Korthas' tortious interference with contract claim. *See Local 926, Int'l Union of Operating Engineers v. Jones, 460 U.S. 669, 103 S. Ct. 1453, 75 L. Ed. 2d 368 (1983)* (claim against union for coercing employer to breach employment contract preempted by NLRA); *Volentine v. Bechtel, Inc., 27 F.Supp.2d 728, 736 (E.D.Tex. 1998)* ("To permit Plaintiffs' state-law claims for tortious interference with contract and conspiracy to tortiously interfere with contract to proceed would violate the very core of Garmon--namely, to permit discordant state-law claims to disrupt the uniform application of federal labor law across the nation . . . ."); *Board of Trustees of Sheet Metal Workers Local Union No. 137 Ins. v. Silverstein, 1995 U.S. Dist. LEXIS 9330, 1995 WL 404873 (S.D.N.Y. 1995)* (tort claim against union for engaging in concerted action which interferes with an employer's contractual relations with customers preempted by NLRA); *see also Kaufman v. Allied Pilots Ass'n, 274 F.3d 197, 204 (5th Cir. 2001)* [*47] (dismissing plaintiff's state law tortious interference with contract claim as Garmon preempted). Accordingly, defendants' motion for summary judgment as to NLRA preemption with regarding Korthas' claim for tortious interference with contract is GRANTED.

## VI. Plaintiff's Claims on the Merits

As their final argument, defendants attack Korthas' claims on the merits. The court has already found Korthas' intentional infliction of emotional distress, defamation, malicious prosecution, and false imprisonment claims as to Northeast Foods preempted by *§ 301 of the LMRA* and time-barred by the applicable statute of limitations. The court has also already found

Korthas' tortious interference with contract claim as to all defendants preempted by both the NLRA and *§ 301* of the LMRA and time-barred by the applicable statute of limitations. The question remains whether the court should exercise its supplemental jurisdiction pursuant to *28 U.S.C. § 1367(c)* over Korthas' state law claims for intentional infliction of emotional distress, defamation, malicious prosecution, and false imprisonment as to Blauvelt and as to Northeast Foods assuming *arguendo* that [*48] any of Korthas' claims as to Northeast Foods are not preempted.

### A. Supplemental Jurisdiction

In Valencia ex rel. Franco v. Lee, the Second Circuit set forth factors that a district court should consider when deciding whether to exercise supplemental jurisdiction after all federal law claims have been dismissed from a case. *316 F.3d 299, 305-06 (2d Cir. 2003)*. These factors include: (1) whether state law claims implicate the doctrine of preemption; (2) considerations of judicial economy, convenience, fairness, and comity, including the stage of proceedings when the federal claims are dismissed; (3) the existence of novel or unresolved questions of state law; and (4) whether the state law claims concern the state's interest in the administration of its government or require the balancing of numerous important state government policies. Id.; *see also Baylis v. Marriott Corp., 843 F.2d 658, 665 (2d Cir.1988)* ("One factor that may sometimes favor retaining pendent jurisdiction is when a state claim is closely tied to questions of federal policy and where the federal doctrine of preemption may be implicated.").

Here, the state law claims implicate [*49] the doctrine of preemption and present no novel or unresolved questions of state law. The court "concludes that the primacy of the preemption questions raised . . . make[s] it appropriate to exercise supplemental jurisdiction." *In re Jetblue Airways Corp. Privacy Litigation, 379 F.Supp.2d 299, 311 (E.D.N.Y. 2005); see Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 167 n.4 (2d Cir.1989)* ("While not determinative, the implication of federal labor policy and preemption issues would lend support to a decision by the district to exercise pendent jurisdiction over a state law claim."); *Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir.1998)* ("Because the remaining state law claims implicate the doctrine of preemption, we cannot say that the district court's exercise of supplemental jurisdiction in this case

2006 U.S. Dist. LEXIS 18846, *49

was an abuse of its discretion.").

### B. Defamation, Tortious Interference with Contract and False Imprisonment

Korthas' counsel concedes "that the claims alleging defamation, tortious interference with contract and false imprisonment are insufficient." Dkt. No. 7, Pl.'s Mem. of Law at 3. Accordingly, Korthas' claims for defamation, [*50] tortious interference with contract and false imprisonment are DISMISSED.

### C. Intentional Infliction of Emotional Distress

As noted above, to state a claim of intentional infliction of emotional distress, a plaintiff must establish: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender, 78 F.3d at 790.* New York strictly applies each of these elements. *Rivera v. City of New York, 392 F.Supp.2d 644, 657-58 (S.D.N.Y. 2005)* (citing *Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993)).* The bar for an intentional infliction of emotional distress claim is set high such that the conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983).* Here, the court concludes that defendants' alleged conduct, *supra,* [*51] is far removed from the type suitable to sustain a claim of intentional infliction of emotional distress and summary judgment is appropriate on this basis.

In addition, the New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available. *See, e.g., Fischer v. Maloney, 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978).* This rule has been consistently applied by lower state courts and federal courts applying New York law. As one federal district court described the matter, in New York, "intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort," when traditional tort remedies are unavailable. *See EEOC v. Die Fliedermaus, L.L.C., 77 F.Supp.2d 460, 472 (S.D.N.Y. 1999)* (quoting *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc., 256 A.D.2d 269, 682 N.Y.S.2d 167, 169 (1st Dep't 1998)).* Accordingly, "no intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Hansel v. Sheridan, 991 F.Supp. 69, 75 (N.D.N.Y. 1998).* [*52] In the instant case, because the conduct of which Korthas complains is encompassed within his claims for defamation, tortious interference with contract, malicious prosecution and false imprisonment, his claim for intentional infliction of emotional distress must be dismissed. Defendants' motion for summary judgment dismissing Korthas' claim for intentional infliction of emotional distress is GRANTED.

### D. Malicious Prosecution

As noted above, to prove his claim of malicious prosecution, Korthas must establish: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir.1995).* As noted above, Korthas asserts that he was "charged with harassment by actions of the defendants" but was not convicted. Korthas alleges, "upon in formation and belief," that defendants "knew that there was no reasonable belief that [Korthas] had threatened anyone" and that "defendants acted with malice toward [Korthas] having him arrested." Dkt. No. [*53] 6, Am. Compl. at PP31-34. Korthas asserts that the "criminal charge was dismissed on the merits on May 20, 2002." *Id.* at P32A. Additionally, Korthas alleged that "upon information and belief, Northeast Foods, Inc., through its agents, did place an emergency call to the Auburn Police Department alleging that [Korthas] was threatening co-workers with a pocket knife." Korthas asserts that his prosecution for harassment was caused by the actions of Blauvelt. *See id.* at P16. Defendants dispute the sufficiency of the allegations with respect to the first, third and fourth elements of malicious prosecution.

The New York Court of Appeals discussed the first element of malicious prosecution in Broughton v. State: "the essence of malicious prosecution is the perversion of proper legal procedures. Thus, it has been held that some sort of prior judicial proceeding is the *sine qua non* of a cause of action in malicious prosecution. Such a judicial proceeding may be either an evaluation by a Magistrate of an affidavit supporting an arrest warrant application, or an arraignment or an indictment by a Grand Jury." 37

*N.Y.2d 451, 457, 335 N.E.2d 310, 373 N.Y.S.2d 87, 93-94 (1975)* [*54] (citation omitted). Thus, a malicious prosecution "may arise only after an arraignment or indictment or some other 'evaluation by a neutral body that the charges [were] warranted.'" *Stile v. City of New York, 172 A.D.2d 743, 743, 569 N.Y.S.2d 129 (2d Dep't 1991)* (quoting *Broughton, 37 N.Y.2d at 459*).

Here, Korthas' Amended Complaint does not allege that Korthas was arraigned, indicted, or that an arrest warrant was evaluated by a Magistrate. The closest Korthas comes to making such an allegation is an argument in his memorandum of law where he states that "Blauvelt was not performing any duty prescribed by his union when he signed the accusatory instrument." Dkt. No. 7, Pl.'s Mem. of Law at 2-3. Korthas points to no holding by any court that the first element of a civil claim for malicious prosecution is satisfied when a complaint is sworn to or the accusatory instrument is signed by the complaining party. "Thus, under the New York decisions, the threshold trigger for the tort of malicious prosecution is a *judicial proceeding* where the charges against the accused are reviewed and evaluated by a neutral body." *Silver v. Kuehbeck, 2005 U.S. Dist. LEXIS 26956, 2005 WL 2990642,* [*55] *at *5 (S.D.N.Y. Nov. 7, 2005)* (citing *Broughton, 37 N.Y.2d at 459*). A Magistrate's evaluation of an affidavit supporting an arrest warrant application, an arraignment, and an indictment by a Grand Jury each involve some kind of "evaluation by a neutral body that the charges [were] warranted." *Stile, 172 A.D.2d 743, 569 N.Y.S.2d 129.* The pleading in the sworn information/complaint against Korthas does not reveal any evaluation by a neutral body. *See Silver, 2005 U.S. Dist. LEXIS 26956, 2005 WL 2990642, at *6.* Moreover, "a civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution." *Levy v. Grandone, 14 A.D.3d 660, 661, 789 N.Y.S.2d 291, 293 (2d Dep't 2005)*

(citations omitted); *see also DeFilippo v. County of Nassau, 183 A.D.2d 695, 696, 583 N.Y.S.2d 283, 284 (2d Dep't 1992)* ("The mere reporting of a crime to police and giving testimony are insufficient; it must be shown that defendant played an active [*56] role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.") (citation omitted). Accordingly, the court finds that Korthas has failed to establish that defendants initiated or continued a criminal prosecution against him. Furthermore, Korthas has not established that defendants lacked probable cause or acted maliciously in contacting the Police regarding his conduct. Defendants' motion for summary judgment dismissing Korthas' claim for malicious prosecution is GRANTED.

## CONCLUSION

**WHEREFORE,** after careful consideration of the file in this matter including the parties' submissions, oral argument, and the applicable law, the court hereby

**GRANTS** Korthas' motion to amend his complaint and further

**DENIES** Korthas' motion to remand the case to state court and further

**GRANTS** defendants' motion for summary judgment and **DISMISSES** Korthas' Amended Complaint in its entirety.

**IT IS SO ORDERED.**

Dated: February 27, 2006

Syracuse, New York

Howard G. Munson

Senior U.S. District Judge

# EXHIBIT D

**TO:**      **Directors of Security**
             **Directors of Surveillance**

**FROM:**    **PA Gaming Control Board**
             **Pennsylvania State Police**

**SUBJECT:   Operator Notification to PSP/PGCB**


The following is a list of incidents that require notification to PSP, County 911 Centers, and/or PGCB.  This list may not be all inclusive and is subject to change, addition or deletion by PSP and PGCB.

A reminder that the function and responsibility of the PGCB is the oversight and enforcement of all regulatory issues and the function and responsibilities of PSP is the enforcement of the law.  Thus, as reflected below, PSP will be the primary notification on all criminal activity and PGCB on all regulatory issues.

In a number of situations, as reflected below, dual notification to both PGCB and PSP will be mandated.  Notification to County 911 Centers will be required in certain circumstances as it involves a response by both PSP on site, the local primary law enforcement agency having jurisdiction on criminal incidents and some other major incidents.

Immediate notification is described as within 15 minutes notification to PSP and/or PGCB.  Obviously, in most situations immediate notification should be as described – immediate. Secondary notification is described as within 24 hours.

Notification will be made to PSP, County 911 Centers, and/or PGCB via phone to a pre-determined number(s).  PSP and PGCB may also possess an in-house radio and may be available to communicate via radio should the need dictate.

| INCIDENT | NOTIFICATION | PGCB/PSP/911 |
|---|---|---|
| Armored Car Delivery/Pick Up | Immediate | PGCB/PSP |
| Regulatory Violation | Immediate | PGCB |
| Drop Route Modification | Secondary w/ approval | PGCB |
| Delay/Change Drop Time | Immediate | PGCB/PSP |
| Emergency BV Pull | Immediate | PGCB |
| Kiosk Impressment | Immediate | PGCB/PSP |
| Player Disputes (over $500) | Immediate | PGCB |
| Power Interruption (brown-out) | Secondary | PGCB |
| Modifications to Surveillance System | Secondary w/ approval | PGCB |
| Slot Layout Change | Secondary w/ approval | PGCB |
| Change to Security/Surv Min. Staffing | Immediate | PGCB |
| Robbery | Immediate | PSP/PGCB |
| Death Investigations | Immediate | PSP/PGCB |
| Sex Offenses | Immediate | PSP/PGCB |
| Fire | Immediate | PSP/911/PGCB |
| Terroristic Threats | Immediate | PSP/PGCB |
| Bomb Threat | Immediate | PSP/PGCB |
| Natural Disaster | Immediate | PSP/911/PGCB |
| Hazardous Material Incident | Immediate | PSP/911/PGCB |
| Theft | Immediate | PSP/PGCB |
| Embezzlement | Immediate | PSP/PGCB |
| Power Failure – sustained blackout | Immediate | PSP/PGCB |
| Assault w/ Deadly Weapon | Immediate | PSP |
| Assault | Immediate | PSP |
| Stolen Check | Immediate | PSP |
| Forged Check | Immediate | PSP |
| Closed Checking Account | Immediate | PSP |
| Closed Credit Card Account | Immediate | PSP |
| Identity Theft Cases | Immediate | PSP |
| Counterfeit Currency (suspect) | Immediate | PSP/PGCB |
| Counterfeit Currency (soft count) | Secondary | PSP/PGCB |
| Illicit Drugs (suspect) | Immediate | PSP |
| Illicit Drugs (found) | Immediate | PSP |
| Cheating/Suspected Cheating | Immediate | PSP/PGCB |
| Gaming Excluded Person | Immediate | PGCB/PSP |
| Eviction | Secondary | PSP/PGCB |
| Ejection | Secondary | PSP/PGCB |
| Defiant Trespass | Secondary | PSP |
| Disorderly Conduct | Secondary | PSP |
| Employee Incident – Arrest/Inv. | Immediate | PSP/PGCB |
| Missing Controlled Key | Immediate | PGCB |
| Major Jackpot ($25K and above) | Immediate | PGCB |
| Crimes Where Suspect Is Fleeing | Immediate | PSP |
| Confirmed Variance (over $200) | Immediate | PSP |
| Child Endangerment | Immediate | PSP |
| Self/State Exclusion Violation | Immediate | PGCB/PSP |
| Self Exclusion Intake Request | Immediate | PGCB |
| Voluntary Credit Suspension Intake | Immediate | PGCB |

Sep 17 2010